THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EMMA JEAN YATES *et al.*, Defendants-Appellants.

First District (1st Division)   No. 77-1085

Opinion filed October 16, 1978.

Ralph Ruebner and David Mejia, both of State Appellate Defender's Office, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Michael E. Shabat, Joan S. Cherry, and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendants, Emma Jean Yates and Shirley Yates, were indicted for the murder of Charlotte Henderson. They were found guilty of murder by a jury in the circuit court of Cook County and were each sentenced to imprisonment for from 15 to 25 years.

On appeal, defendants argue that (1) the evidence revealed that they were acting under a sudden and intense passion resulting from serious provocation by the deceased, and that therefore they are guilty only of voluntary manslaughter, and (2) the court committed prejudicial error by excluding evidence offered by the defense to show the deceased's violent disposition when drinking.

Charlotte Henderson, known as Cookie, died as the result of a stab wound inflicted by the hand of Emma Yates on July 11, 1976, at about 11:30 a.m. A toxicologist found that the victim had been under the influence of alcohol at the time of her death. Examination of the body also revealed recent wounds on the victim's wrists which could have been self-inflicted.

Two eyewitnesses to the stabbing testified for the State. Tommy Morris was standing in front of his shop at 3401 West 5th Avenue, Chicago, talking to Floyd Stanley, when Morris' wife walked up to the men and told them about an incident occurring at Jackson and Homan. Morris and Stanley walked to the intersection of Jackson and Homan; Morris estimated that it took about half a minute to walk the distance. Morris saw the deceased on the north side of Jackson, trying to go east, and holding a knife in her hand. He also saw the defendant Shirley Yates, holding a knife, talking to a man in the middle of the street. Emma Yates was

standing near Shirley. After a short time, Shirley followed the deceased and Emma also moved toward her. Morris said that Emma told Shirley, "If you won't stab the bitch, give me the knife," after which Shirley passed the knife to Emma. Emma then stabbed the deceased in the back below the shoulder blade. Shirley then kicked the victim "in the behind," announced her address to the onlookers and left with Emma. On cross-examination, Morris testified that Cookie waved her knife at Emma before the stabbing. When he last saw the defendants, they were running east on Jackson.

Floyd Stanley testified that he saw the deceased, holding a knife in her hand, coming east on Jackson, and Shirley coming after her with a knife. Emma ran up to Cookie, and Cookie raised her knife at her and "kind of swung at her." Someone said, "Give me the knife" and he next saw that Emma had the knife in her hand. Emma moved toward Cookie and "cut her." Shirley then "made a pass" at Cookie. Stanley then left to call an ambulance. On cross-examination, Stanley said he was really paying attention to the knife in Emma's hand, not the knife in Cookie's hand.

Ralph Gibson of the Chicago police department testified for the State that he arrived at the scene and saw a woman's body lying in the street with a wound in the back. He discovered a knife, which he identified at trial, in some shrubbery nearby. After speaking to the bystanders, he went to Cook County Hospital. Outside the hospital he saw defendant Shirley Yates, who fit the description he had been given of one of the assailants. She told him her name and he placed her under arrest. He took her to the police room at the hospital and advised her of her rights. Shirley said that she understood her rights. Gibson asked if she knew anything about the stabbing and Shirley said that she was there, but that she did not do it. Cookie had had an argument with Shirley's mother at the mother's apartment. The mother told Cookie to leave, then followed Cookie out to the front porch and returned with a wound on her chin, saying, "That bitch just cut me." Shirley and Emma then chased Cookie down the street to Jackson and Homan, where they chased Cookie around a car. Shirley had a knife and so did Cookie. Emma said, "Give me that knife, you are not going to do anything with it." Shirley then gave the knife to Emma. Shirley hit Cookie in the face, Emma stabbed her and Cookie fell to the ground. Shirley kicked Cookie and then went home with Emma.

Officer Gibson further testified that Shirley told him Emma was at home. He went with Shirley to the apartment at 3423 West Madison and arrested Emma there. He advised her of her rights and Emma gave him an oral statement in the squad car. She said that her mother had come into the apartment with her chin cut and said that Cookie had cut her. She and her sister Shirley then chased Cookie to Jackson and Homan and around a parked car there. Emma told her sister, "You are not going to do anything

with that knife. Give the knife to me." Shirley gave the knife to Emma. Emma said that Cookie was between Shirley and Emma, when Shirley struck Cookie in the face, and Emma stabbed Cookie.

On cross-examination, Gibson admitted that he had not written down in any police report or elsewhere the detailed narrative of the statements made by Shirley and Emma. His report states only that both readily admitted their part in the incident. Gibson estimated the distance from the apartment to the scene of the offense as between 1½ and 2½ blocks.

Ronald Bredeman, an assistant State's Attorney of Cook County, testified that he saw Shirley Yates in police custody on July 11, 1976, at about 3 p.m. He sat down with her alone, identified himself as a prosecutor, and told her that he was not her attorney. He advised Shirley of her rights and she responded that she understood them and wished to give them up. Shirley then gave him an oral statement with Bredeman related to the jury, and which was substantially the same as that related by Officer Gibson. Bredeman then went into another room where he sat alone with Emma Yates. He advised her of her rights, identified himself, and heard Emma give an account of the occurrence, which Bredeman also repeated and which also was substantially the same as that related by Gibson. Bredeman then returned to Shirley with a court reporter and a policeman. Bredeman then interrogated Shirley Yates, and the court reporter stenographically recorded the questions and answers. When they finished with Shirley, Bredeman, the court reporter and the policeman went into the adjacent room and followed the same procedure with Emma Yates. The court reporter then immediately transcribed her machine notes into typewritten pages. Shirley Yates appeared to read the transcript of her statement, agreed that it was correct and signed it in the presence of witnesses. Emma Yates also read the transcript of her own statement and signed it in the presence of witnesses.

On cross-examination, Bredeman admitted that he had never told either Emma or Shirley that they would be charged with murder.

The statements were introduced into evidence and read to the jury. Shirley Yates had stated that on July 11, 1976, at 11:30 a.m., she and her sister were at their mother's house when Cookie, who lived upstairs, came down the stairs and stuck her head through the door. Shirley's mother exchanged verbal abuse with Cookie, and the mother picked up a bottle and hit Cookie in the stomach with it. Cookie was told to leave and she did, removing a knife from her socks as she left, and challenging the mother to follow. The mother went out on the porch and came back into the apartment, bleeding from the throat. Shirley took a knife, which her mother had received from Shirley, from her mother's hand and ran after Cookie, saying, "Bitch, I'm going to kill you." Emma also ran after Cookie, who stopped at Jackson and Homan and was chased around a car

by Shirley and Emma. Cookie was coming toward Emma with her knife, so Emma took the knife from Shirley's hand, saying, "Let me stab the bitch." As Cookie was going toward Emma with the knife, Shirley hit Cookie in the jaw with her fist. At this time, Shirley was standing next to a man whose car had been hit by a juice bottle which Shirley had thrown at Cookie. Emma then stabbed Cookie in the back, and Shirley and Emma then ran back to the house. Shirley took her mother to the hospital.

Emma Yates, in her statement, said that she was at her mother's home when Cookie came in the door. The mother told her to get out, but Cookie would not leave until the mother picked up a bottle and chased her out. Cookie stopped in the hallway and took a knife out of her socks. Emma closed the door, but her mother opened it and went out. Cookie stabbed the mother, and Shirley and Emma then chased Cookie to Jackson and Homan. Cookie had a knife in her hands. Shirley gave her knife to Emma. "And Shirley was saying something and Shirley hit Cookie in the jaw. Cookie didn't pay no mind. Cookie came at me with the knife, that's when I stabbed her." Emma saw Shirley kick Cookie after the stabbing. While they were chasing Cookie, Shirley had thrown a bottle which hit a car, breaking the side view mirror. Emma and Shirley then went home and Emma tossed the knife into a yard along the way.

It was stipulated that Emma Yates was 17 and Shirley Yates was 19.

Emma Yates took the stand and testified in her own defense. She was at home with her mother, her sister Shirley and her mother's boyfriend, when Cookie came to the door. Her mother and Cookie had a conversation and "Mama picked up a bottle," but Shirley took the bottle away; Cookie was not hit with the bottle. Cookie was repeatedly told to leave by Emma and her mother, and she finally did leave. Emma was not holding a knife and neither was Cookie at this time. The mother sat down, but 15 to 20 minutes later she stood up and walked out of the apartment, and Shirley followed. Emma started cooking, then looked into the hallway and saw her mother bleeding from the neck, and Cookie in the hallway with a knife in her hand. Cookie ran down the stairs and Emma ran after her. Shirley followed Emma.

The sisters chased Cookie to Jackson and Homan, which, Emma testified, was just over a block away from the apartment. Cookie started running around a parked car. Shirley threw a juice bottle, which hit the side of a moving car. The car stopped, the driver got out and Shirley talked to the driver, with Emma standing nearby. Both Shirley and Emma had their backs toward Cookie at this time. Shirley had a knife in her hand. Cookie waved the knife she was holding at Emma. Emma testified that her thoughts were that "she had just stabbed my mother and she was coming towards me and I was afraid that I was next, so just stop her." Emma took the knife from Shirley and "swung it" to protect herself,

stabbing Cookie. Cookie then turned away and walked off; she did not fall to the ground. Emma testified that she did not see Shirley kick Cookie. Shirley then called out their address and the sisters walked home.

The police never told her that she was charged with murder. She gave the statement in the station because she felt that she had nothing to hide; she had only been defending herself.

Emma further testified that she had been present, 1½ weeks before the stabbing, when Cookie had tried to kill herself by jumping out of a window. At that time Cookie had laughed, then cried, then began singing when she jumped from the third floor. Cookie had also cut her own wrists the day before the stabbing and had been bandaged at a hospital. Cookie was known to carry a knife.

On cross-examination, Emma acknowledged that her statements to Officer Gibson and assistant State's Attorney Bredeman had been voluntary. She did not know if she had called to bystanders to help her stop Cookie for stabbing her mother nor could she recall hearing Shirley say anything. Emma denied that she said, "Give me that knife. If you are not going to stab that bitch, I will." Cookie had come at her, swinging her knife over her head, and was within "hugging distance," when Emma stabbed her. While Emma's view was partially blocked by a car, it appeared to her that Shirley did kick Cookie after the stabbing.

On redirect examination, Emma testified that she was pregnant at the time of the stabbing, and that she was frightened and in fear for her life when she swung her knife at Cookie. She had not learned that Cookie had died and that she had been charged with murder until after her statement had been taken.

The defense called no other witnesses and made no offer of proof. The jury was instructed and returned verdicts of guilty of murder against both Shirley Yates and Emma Yates.

Defendants now argue that because they were acting under a sudden and intense passion provoked by the deceased, they are guilty of voluntary manslaughter, not murder. (Ill. Rev. Stat. 1975, ch. 38, pars. 9—2(a)(1) and 9—1, respectively.) Defendants proceeded at trial on a theory of self-defense and did not request an instruction be given on voluntary manslaughter-sudden and intense passion. (Ill. Rev. Stat. 1975, ch. 38, par. 9—2(a)(1); IPI Criminal No. 7.04.) Defendants did raise the issue in their post-trial motion. We have considered the argument and find it to be meritless.

■■■ First, a claim of self-defense negatives an inference of sudden and intense passion. (*People v. Parker* (1976), 40 Ill. App. 3d 597, 352 N.E.2d 394; *People v. Clark* (1973), 15 Ill. App. 3d 756, 305 N.E.2d 218.) Defendants' statements and the testimony of Emma Yates reveal no sudden and intense passion. Emma's testimony indicates that her act was

deliberate; she did not testify that she could not control herself. "The present suggestion amounts to a request that because the jury rejected the claim of self-defense, this court should try the defendant[s] again on a different legal theory. This we decline to do." *People v. McKinney* (1968), 40 Ill. 2d 372, 375, 240 N.E.2d 577, 579.

■■ Second, the jury's verdict of guilty of murder indicates its conclusion that all elements of the offense had been proved beyond a reasonable doubt and that no circumstances existed which would have justified, or even allowed defendants to unreasonably believe that there was justification for, the killing. (*People v. Peery* (1976), 41 Ill. App. 3d 533, 536, 354 N.E.2d 536, 539.) Having reviewed the evidence in detail, we are convinced that it amply justifies the verdicts of guilty of murder beyond a reasonable doubt.

This record reveals a concerted, deliberate attack by Shirley and Emma Yates against their victim, motivated not by a sudden and intense passion but by cold-blooded revenge. They chased Charlotte Henderson not to hold her for the police, but to strike back and punish her for stabbing their mother. The testimony of the distinterested eyewitness Morris, and the oral and written statements of Shirley Yates, reveal that Emma Yates took the knife from her sister with the vicious intent to "stab the bitch," not with the intent to protect herself.

Furthermore, the statements of defendants clearly show that their victim, who was initially an aggressor against their mother, retreated from contact with the sisters. This negates any inference of mutual combat. (*People v. Jackson* (1975), 35 Ill. App. 3d 215, 340 N.E.2d 673.) The victim ran away from the apartment until the defendants caught up to her at Jackson and Homan, where they chased the victim around a car. And their hot pursuit was interrupted for a time by the discussion Shirley Yates had with the man whose car had been hit by the bottle she had thrown. The whole occurrence at Jackson and Homan continued for a sufficiently long time for Morris' wife to travel the 1½ blocks to where Morris and Stanley were standing, and for Morris and Stanley to walk that distance back to the scene in time to view the stabbing. The interruption and length of time which elapsed eliminate any inference of Emma and Shirley acting under a sudden and intense passion. *People v. Clark* (1973), 15 Ill. App. 3d 756, 305 N.E.2d 218.

Emma Yates' testimony that she had given her statements to the police and State's Attorney because she felt she had nothing to hide may be true, but it does not relieve her of criminal responsibility for the killing. Although she saw nothing wrong with what she and her sister had done, based on these facts the jury, the trial court and this court have the duty to apply the law. Defendants were guilty of the crime of murder.

Defendants also argue that prejudicial error was committed by the

trial court in refusing to admit the testimony of Dr. Delcampo, who would have testified, on the basis of his examination of Charlotte Henderson six months prior to the occurrence, that the deceased was suffering from a chronic psychosis and had violent characteristics and tendencies when drinking. Defendants argue that the doctor's testimony would have corroborated and supported their self-defense assertion at trial.

The State had objected to the admission of the testimony of Dr. Delcampo, a psychiatrist who had examined the decedent in December of 1975 during a voluntary admission to a State hospital. The doctor had prepared a report which indicated that the decedent suffered from self-destructive tendencies while under the influence of alcohol, but when she was last seen by the doctor her condition had improved. The court read the report, which was tendered by defense counsel, and then stated that he believed that the examination had been made too long before the date of the stabbing to be probative of decedent's mental state on July 11, 1976. However, the court repeatedly offered to hear the doctor's testimony outside the presence of the jury to determine whether the doctor could testify to anything not contained in his report which would be relevant. The doctor did not come to court and the court rejected an offer of proof based on the report. The court permitted the defense to rest its case subject to reopening should the doctor be called and be shown to have relevant knowledge or opinions. But the defense did not call the doctor to testify.

● 4 We agree with the trial court's ruling that the doctor's examination of the victim was too remote in time from the occurrence. Just as evidence of a defendant's prior mental disease is not probative of his mental state at the time of the offense (*People v. Davidson* (1967), 82 Ill. App. 2d 245, 225 N.E.2d 727), we do not believe that an opinion of this expert, who had not examined the decedent for more than six months prior to her death, would be probative of her mental condition at the time of the offense. Moreover, there was direct observational evidence of the decedent's behavior, given by defendants themselves, as well as by the eyewitness. All agreed that the defendants were pursuing the victim, who had been trying to escape them. As we have said above, where the initial aggressor retreats, there can be no self-defense justification for the pursuers' actions. *Jackson; People v. Hines* (1975), 31 Ill. App. 3d 295, 334 N.E.2d 233.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

GOLDBERG, P. J., and BUCKLEY, J., concur.