# ARAVE, WARDEN *v.* CREECH

No. 91–1160.   Argued November 10, 1992—Decided March 30, 1993

464

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 479.

*Lynn E. Thomas*, Deputy Attorney General of Idaho, argued the cause for petitioner. With her on the briefs was *Larry EchoHawk*, Attorney General.

*Cliff Gardner* argued the cause for respondent. With him on the brief was *Claude M. Stern*.

JUSTICE O'CONNOR delivered the opinion of the Court.

In 1981 Thomas Eugene Creech beat and kicked to death a fellow inmate at the Idaho State Penitentiary. He pleaded guilty to first-degree murder and was sentenced to death. The sentence was based in part on the statutory aggravating circumstance that "[b]y the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life." Idaho Code § 19–2515(g)(6) (1987). The sole question we must decide is whether the "utter disregard" circumstance, as interpreted by the Idaho Supreme Court, adequately channels sentencing discretion as required by the Eighth and Fourteenth Amendments.

I

The facts underlying this case could not be more chilling. Thomas Creech has admitted to killing or participating in the killing of at least 26 people. The bodies of 11 of his victims—who were shot, stabbed, beaten, or strangled to death—have been recovered in seven States. Creech has

said repeatedly that, unless he is completely isolated from humanity, he likely will continue killing. And he has identified by name three people outside prison walls he intends to kill if given the opportunity.

Creech's most recent victim was David Dale Jensen, a fellow inmate in the maximum security unit of the Idaho State Penitentiary. When he killed Jensen, Creech was already serving life sentences for other first-degree murders. Jensen, about seven years Creech's junior, was a nonviolent car thief. He was also physically handicapped. Part of Jensen's brain had been removed prior to his incarceration, and he had a plastic plate in his skull.

The circumstances surrounding Jensen's death remain unclear, primarily because Creech has given conflicting accounts of them. In one version, Creech killed Jensen in self-defense. In another—the version that Creech gave at his sentencing hearing—other inmates offered to pay Creech or help him escape if he killed Jensen. Creech, through an intermediary, provided Jensen with makeshift weapons and then arranged for Jensen to attack him, in order to create an excuse for the killing. Whichever of these accounts (if either) is true, the Idaho Supreme Court found that the record supported the following facts:

> "Jensen approached Creech and swung a weapon at him which consisted of a sock containing batteries. Creech took the weapon away from Jensen, who returned to his cell but emerged with a toothbrush to which had been taped a razor blade. When the two men again met, Jensen made some movement toward Creech, who then struck Jensen between the eyes with the battery laden sock, knocking Jensen to the floor. The fight continued, according to Creech's version, with Jensen swinging the razor blade at Creech and Creech hitting Jensen with the battery filled sock. The plate imbedded in Jensen's skull shattered, and blood from Jensen's skull was splashed on the floor and walls. Finally, the sock broke

and the batteries fell out, and by that time Jensen was helpless. Creech then commenced kicking Jensen about the throat and head. Sometime later a guard noticed blood, and Jensen was taken to the hospital, where he died the same day." *State* v. *Creech*, 105 Idaho 362, 364, 670 P. 2d 463, 465 (1983), cert. denied, 465 U. S. 1051 (1984).

Creech pleaded guilty to first-degree murder. The trial judge held a sentencing hearing in accordance with Idaho Code § 19–2515(d) (1987). After the hearing, the judge issued written findings in the format prescribed by Rule 33.1 of the Idaho Criminal Rules. Under the heading "Facts and Argument Found in Mitigation," he listed that Creech "did not instigate the fight with the victim, but the victim, without provocation, attacked him. [Creech] was initially justified in protecting himself." App. 32. Under the heading "Facts and Argumen[t] Found in Aggravation," the judge stated:

> "[T]he victim, once the attack commenced, was under the complete domination and control of the defendant. The murder itself was extremely gruesome evidencing an excessive violent rage. With the victim's attack as an excuse, the . . . murder then took on many of the aspects of an assassination. These violent actions . . . went well beyond self-defense.
>
> .  .  .  .  .
>
> ". . . The murder, once commenced, appears to have been an intentional, calculated act." *Id.*, at 32–33.

The judge then found beyond a reasonable doubt five statutory aggravating circumstances, including that Creech, "[b]y the murder, or circumstances surrounding its commission, . . . exhibited utter disregard for human life." *Id.*, at 34. He observed in this context that "[a]fter the victim was helpless [Creech] killed him." *Ibid.* Next, the judge concluded that the mitigating circumstances did not outweigh the aggravat-

ing circumstances. Reiterating that Creech "intentionally destroyed another human being at a time when he was completely helpless," *ibid.*, the judge sentenced Creech to death.

After temporarily remanding for the trial judge to impose sentence in open court in Creech's presence, the Idaho Supreme Court affirmed. The court rejected Creech's argument that the "utter disregard" circumstance is unconstitutionally vague, reaffirming the limiting construction it had placed on the statutory language in *State* v. *Osborn*, 102 Idaho 405, 631 P. 2d 187 (1981):

> "'A . . . limiting construction must be placed upon the aggravating circumstances in I. C. § 19–2515[g](6), that "[b]y the murder, or the circumstances surrounding its commission, the defendant exhibited utter disregard for human life." To properly define this circumstance, it is important to note the other aggravating circumstances with which this provision overlaps. The second aggravating circumstance, I. C. § 19–2515[g](2), that the defendant committed another murder at the time this murder was committed, obviously could show an utter disregard for human life, as could the third aggravating circumstance, I. C. § 19–2515[g](3), that the defendant knowingly created a great risk of death to many persons. The same can be said for the fourth aggravating circumstance, I. C. § 19–2515[g](4), that the murder was committed for remuneration. Since we will not presume that the legislative intent was to duplicate any already enumerated circumstance, thus making [the "utter disregard" circumstance] mere surplusage, we hold that the phrase "utter disregard" must be viewed in reference to acts other than those set forth in I. C. §§ 19–2515[g](2), (3), and (4). We conclude instead that the phrase is meant to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i. e., the cold-blooded, pitiless slayer.'" *Creech, supra,* at 370,

670 P. 2d, at 471 (quoting *Osborn, supra,* at 418–419, 631 P. 2d, at 200–201) (citation omitted).

After independently reviewing the record, the Idaho Supreme Court also held that the evidence clearly supported the trial judge's findings of aggravating and mitigating circumstances, including the finding that Creech had exhibited "utter disregard for human life." 105 Idaho, at 369, 670 P. 2d, at 470. Then, as required by Idaho law, see Idaho Code § 19–2827(c)(3) (1987), the court compared Creech's case to similar cases in order to determine whether his sentence was excessive or disproportionate. The court emphatically concluded that it was not: "We have examined cases dating back more than 50 years and our examination fails to disclose that any such remorseless, calculating, cold-blooded multiple murderer has . . . ever been before this Court." 105 Idaho, at 375, 670 P. 2d, at 476 (footnote omitted).

Creech filed a petition for writ of habeas corpus in the United States District Court for the District of Idaho. The District Court denied relief. See *Creech* v. *Arave,* No. 86–1042 (June 18, 1986). The Court of Appeals for the Ninth Circuit, however, agreed with Creech that the "utter disregard" circumstance is unconstitutionally vague. 947 F. 2d 873 (1991). The court first considered the statutory language itself and concluded that the phrase "utter disregard" does not adequately channel sentencing discretion. *Id.,* at 882–883. The court then considered the *Osborn* narrowing construction and found it unsatisfactory as well. Explaining what "utter disregard" does not mean, the Court of Appeals reasoned, does not give the phrase content. 947 F. 2d, at 883, n. 12. Nor do the words "'the highest, the utmost, callous disregard for human life'" clarify the statutory language; they merely emphasize it. *Id.,* at 883–884 (citing *Maynard* v. *Cartwright,* 486 U. S. 356, 364 (1988)). The phrase "cold-blooded, pitiless slayer" also was deemed inadequate. The Court of Appeals construed our precedents, including *Walton* v. *Arizona,* 497 U. S. 639 (1990), to

require that a limiting construction "defin[e] the terms of the statutory aggravating circumstance through objective standards." 947 F. 2d, at 884. "[C]old-blooded, pitiless slayer" fails, the court said, because it calls for a "subjective determination." *Ibid.* The court found further evidence of the *Osborn* construction's infirmity in its application to this case. In the Court of Appeals' view, the trial judge's findings that Jensen attacked Creech "without provocation" and that the murder "'evidenc[ed] an excessive violent rage'" could not be reconciled with the conclusion that Creech was a "cold-blooded, pitiless" killer. 947 F. 2d, at 884. The Court of Appeals therefore found the "utter disregard" circumstance facially invalid. *Id.,* at 884–885.

Three judges dissented from an order denying rehearing en banc. The dissenters argued that the panel had misconstrued both the "utter disregard" factor and this Court's prior decisions. Whether a defendant is a "cold-blooded, pitiless slayer," they said, is not a subjective inquiry; it is an evidentiary question to be determined from facts and circumstances. *Id.,* at 890 (opinion of Trott, J.). The dissenters found the *Osborn* limiting construction indistinguishable from the construction this Court approved in *Walton.* 947 F. 2d, at 890. We granted certiorari, limited to the narrow question whether the "utter disregard" circumstance, as interpreted by the Idaho Supreme Court in *Osborn,* is unconstitutionally vague. See 504 U. S. 984 (1992).

## II

This case is governed by the standards we articulated in *Walton, supra,* and *Lewis* v. *Jeffers,* 497 U. S. 764 (1990). In *Jeffers* we reaffirmed the fundamental principle that, to satisfy the Eighth and Fourteenth Amendments, a capital sentencing scheme must "'suitably direc[t] and limi[t]'" the sentencer's discretion "'so as to minimize the risk of wholly arbitrary and capricious action.'" *Id.,* at 774 (quoting *Gregg* v. *Georgia,* 428 U. S. 153, 189 (1976) (joint opinion of Stewart,

Powell, and STEVENS, JJ.)). The State must "'channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death.'" 497 U. S., at 774 (quoting *Godfrey* v. *Georgia*, 446 U. S. 420, 428 (1980) (plurality opinion) (internal quotation marks omitted)).

In *Walton* we set forth the inquiry that a federal court must undertake when asked to decide whether a particular aggravating circumstance meets these standards:

> "[The] federal court . . . must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer. If so, then the federal court must attempt to determine whether the state courts have further defined the vague terms and, if they have done so, whether those definitions are constitutionally sufficient, *i. e.*, whether they provide *some* guidance to the sentencer." 497 U. S., at 654 (emphasis in original).

Where, as in Idaho, the sentencer is a judge rather than a jury, the federal court must presume that the judge knew and applied any existing narrowing construction. *Id.*, at 653.

Unlike the Court of Appeals, we do not believe it is necessary to decide whether the statutory phrase "utter disregard for human life" itself passes constitutional muster. The Idaho Supreme Court has adopted a limiting construction, and we believe that construction meets constitutional requirements.

Contrary to the dissent's assertions, see *post*, at 481–485, the phrase "cold-blooded, pitiless slayer" is not without content. Webster's Dictionary defines "pitiless" to mean devoid of, or unmoved by, mercy or compassion. Webster's Third New International Dictionary 1726 (1986). The lead entry for "cold-blooded" gives coordinate definitions. One,

"marked by absence of warm feelings: without consideration, compunction, or clemency," *id.*, at 442, mirrors the definition of "pitiless." The other defines "cold-blooded" to mean "matter of fact, emotionless." *Ibid.* It is true that "cold-blooded" is sometimes also used to describe "premedita[tion]," Black's Law Dictionary 260 (6th ed. 1990)—a mental state that may coincide with, but is distinct from, a lack of feeling or compassion. But premeditation is clearly not the sense in which the Idaho Supreme Court used the word "cold-blooded" in *Osborn.* Other terms in the limiting construction—"callous" and "pitiless"—indicate that the court used the word "cold-blooded" in its first sense. "Premedita[tion]," moreover, is specifically addressed elsewhere in the Idaho homicide statutes, Idaho Code § 18–4003(a) (1987) (amended version at Supp. 1992); had the *Osborn* court meant premeditation, it likely would have used the statutory language.

In ordinary usage, then, the phrase "cold-blooded, pitiless slayer" refers to a killer who kills without feeling or sympathy. We assume that legislators use words in their ordinary, everyday senses, see, *e. g., INS* v. *Phinpathya*, 464 U. S. 183, 189 (1984), and there is no reason to suppose that judges do otherwise. The dissent questions our resort to dictionaries for the common meaning of the word "cold-blooded," *post*, at 482, but offers no persuasive authority to suggest that the word, in its present context, means anything else.

The Court of Appeals thought the *Osborn* limiting construction inadequate not because the phrase "cold-blooded, pitiless slayer" lacks meaning, but because it requires the sentencer to make a "subjective determination." We disagree. We are not faced with pejorative adjectives such as "especially heinous, atrocious, or cruel" or "outrageously or wantonly vile, horrible and inhuman"—terms that describe a crime as a whole and that this Court has held to be unconstitutionally vague. See, *e. g., Shell* v. *Mississippi*, 498 U. S. 1 (1990) *(per curiam); Cartwright,* 486 U. S., at 363–364; *God-*

*frey, supra,* at 428–429. The terms "cold-blooded" and "piti-
less" describe the defendant's state of mind: not his *mens
rea,* but his attitude toward his conduct and his victim. The
law has long recognized that a defendant's state of mind is
not a "subjective" matter, but a *fact* to be inferred from the
surrounding circumstances. See *United States Postal Serv-
ice Bd. of Governors* v. *Aikens,* 460 U. S. 711, 716–717 (1983)
("'The state of a man's mind is as much a fact as the state of
his digestion. It is true that it is very difficult to prove . . . ,
but if it can be ascertained it is as much a fact as anything
else'" (quoting *Edgington* v. *Fitzmaurice,* 29 Ch. Div. 459,
483 (1885))).

Determining whether a capital defendant killed without
feeling or sympathy is undoubtedly more difficult than, for
example, determining whether he "was previously convicted
of another murder," Idaho Code § 19–2515(g)(1) (1987). But
that does not mean that a State cannot, consistent with the
Federal Constitution, authorize sentencing judges to make
the inquiry and to take their findings into account when de-
ciding whether capital punishment is warranted. This is the
import of *Walton.* In that case we considered Arizona's "es-
pecially heinous, cruel, or depraved" circumstance. The Ar-
izona Supreme Court had held that a crime is committed in
a "depraved" manner when the perpetrator "'relishes the
murder, evidencing debasement or perversion,' or 'shows an
indifference to the suffering of the victim and evidences a
sense of pleasure' in the killing." *Walton, supra,* at 655
(quoting *State* v. *Walton,* 159 Ariz. 571, 587, 769 P. 2d 1017,
1033 (1989)). We concluded that this construction ade-
quately guided sentencing discretion, even though "the
proper degree of definition of an aggravating factor of this
nature is not susceptible of mathematical precision." 497
U. S., at 655; accord, *Jeffers,* 497 U. S., at 777; cf. *Proffitt* v.
*Florida,* 428 U. S. 242, 260 (1976) (WHITE, J., concurring in
judgment) (approving Florida statutory aggravating circum-
stances that, "although . . . not susceptible of mechanical ap-

plication . . . are by no means so vague and overbroad as to leave the discretion of the sentencing authority unfettered").

The language at issue here is no less "clear and objective" than the language sustained in *Walton.* Whether a defendant "relishes" or derives "pleasure" from his crime arguably may be easier to determine than whether he acts without feeling or sympathy, since enjoyment is an affirmative mental state, whereas the cold-bloodedness inquiry in a sense requires the sentencer to find a negative. But we do not think so subtle a distinction has constitutional significance. The *Osborn* limiting construction, like the one upheld in *Walton,* defines a state of mind that is ascertainable from surrounding facts. Accordingly, we decline to invalidate the "utter disregard" circumstance on the ground that the Idaho Supreme Court's limiting construction is insufficiently "objective."

Of course, it is not enough for an aggravating circumstance, as construed by the state courts, to be determinate. Our precedents make clear that a State's capital sentencing scheme also must "genuinely narrow the class of persons eligible for the death penalty." *Zant* v. *Stephens,* 462 U. S. 862, 877 (1983). When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. See *Jeffers, supra,* at 776; *Godfrey,* 446 U. S., at 433. If the sentencer fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty, the circumstance is constitutionally infirm. See *Cartwright, supra,* at 364 (invalidating aggravating circumstance that "an ordinary person could honestly believe" described every murder); *Godfrey, supra,* at 428–429 ("A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman'").

Although the question is close, we believe the *Osborn* construction satisfies this narrowing requirement. The class of murderers eligible for capital punishment under Idaho law is defined broadly to include all first-degree murderers. Idaho Code § 18–4004 (1987). And the category of first-degree murderers is also broad. It includes premeditated murders and those carried out by means of poison, lying in wait, or certain kinds of torture. § 18–4003(a). In addition, murders that otherwise would be classified as second degree, § 18–4003(g)—including homicides committed without "considerable provocation" or under circumstances demonstrating "an abandoned and malignant heart" (a term of art that refers to unintentional homicide committed with extreme recklessness, see American Law Institute, Model Penal Code § 210.2(1)(b) Comment, n. 4 (1980)), Idaho Code §§ 18–4001, 18–4002 (1987)—become first degree if they are accompanied by one of a number of enumerated circumstances. For example, murders are classified as first degree when the victim is a fellow prison inmate, § 18–4003(e), or a law enforcement or judicial officer performing official duties, § 18–4003(b); when the defendant is already serving a sentence for murder, § 18–4003(c); and when the murder occurs during a prison escape, § 18–4003(f), or the commission or attempted commission of arson, rape, robbery, burglary, kidnaping, or mayhem, § 18–4003(d). In other words, a sizable class of even those murderers who kill with some provocation or without specific intent may receive the death penalty under Idaho law.

We acknowledge that, even within these broad categories, the word "pitiless," standing alone, might not narrow the class of defendants eligible for the death penalty. A sentencing judge might conclude that every first-degree murderer is "pitiless," because it is difficult to imagine how a person with any mercy or compassion could kill another human being without justification. Given the statutory scheme, however, we believe that a sentencing judge reason-

ably could find that not all Idaho capital defendants are "cold-blooded." That is because some within the broad class of first-degree murderers *do* exhibit feeling. Some, for example, kill with anger, jealousy, revenge, or a variety of other emotions. In *Walton* we held that Arizona could treat capital defendants who take pleasure in killing as more deserving of the death penalty than those who do not. Idaho similarly has identified the subclass of defendants who kill without feeling or sympathy as more deserving of death. By doing so, it has narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed.

Creech argues that the Idaho courts have not applied the "utter disregard" circumstance consistently. He points out that the courts have found defendants to exhibit "utter disregard" in a wide range of cases. This, he claims, demonstrates that the circumstance is nothing more than a catch-all. The dissent apparently agrees. See *post*, at 485–487. The State, in turn, offers its own review of the cases and contends that they are consistent. In essence, the parties and the dissent would have us determine the facial constitutionality of the "utter disregard" circumstance, as construed in *Osborn*, by examining applications of the circumstance in cases not before us.

As an initial matter, we do not think the fact that "[a]ll kinds of . . . factors," *post*, at 486, may demonstrate the requisite state of mind renders the *Osborn* construction facially invalid. That the Idaho courts may find first-degree murderers to be "cold-blooded" and "pitiless" in a wide range of circumstances is unsurprising. It also is irrelevant to the question before us. We did not undertake a comparative analysis of state court decisions in *Walton*. See 497 U. S., at 655 (construing the argument that the aggravating circumstance "has been applied in an arbitrary manner" as a challenge to the state court's proportionality review). And in *Jeffers* we stated clearly that the question whether state

courts properly have applied an aggravating circumstance is separate from the question whether the circumstance, as narrowed, is facially valid. See 497 U. S., at 778–780. To be sure, we previously have examined other state decisions when the *construction* of an aggravating circumstance has been unclear. In *Sochor* v. *Florida,* 504 U. S. 527 (1992), for example, the argument was that the state courts had not adhered to a single limiting construction of Florida's "heinous, atrocious, or cruel" circumstance. *Id.,* at 536–537; see also *Proffitt* v. *Florida,* 428 U. S., at 255, n. 12 (joint opinion of Stewart, Powell, and STEVENS, JJ.) (reviewing other cases to establish that the state courts had construed an aggravating circumstance consistently). Under our precedents, a federal court may consider state court *formulations* of a limiting construction to ensure that they are consistent. But our decisions do not authorize review of state court cases to determine whether a limiting construction has been *applied* consistently.

A comparative analysis of state court cases, moreover, would be particularly inappropriate here. The Idaho Supreme Court upheld Creech's death sentence in 1983—before it had applied *Osborn* to any other set of facts. None of the decisions on which the dissent relies, or upon which Creech asks us to invalidate his death sentence, influenced either the trial judge who sentenced Creech or the appellate judges who upheld the sentence. And there is no question that Idaho's formulation of its limiting construction has been consistent. The Idaho Supreme Court has reaffirmed its original interpretation of "utter disregard" repeatedly, often reciting the definition given in *Osborn* verbatim. See, *e. g., State* v. *Card,* 121 Idaho 425, 435–436, 825 P. 2d 1081, 1091–1092 (1991) (citing cases), cert. denied, 506 U. S. 915 (1992). It also has explained that "utter disregard" differs from Idaho's "heinous, atrocious or cruel" aggravating circumstance, Idaho Code § 19–2515(g)(5) (1987), because the *Osborn* construction focuses on the defendant's state of mind. *State* v.

*Fain,* 116 Idaho 82, 99, 774 P. 2d 252, 269 ("[T]he 'utter disregard' factor refers not to the outrageousness of the acts constituting the murder, but to the defendant's lack of conscientious scruples against killing another human being"), cert. denied, 493 U. S. 917 (1989). In light of the consistent narrowing definition given the "utter disregard" circumstance by the Idaho Supreme Court, we are satisfied that the circumstance, on its face, meets constitutional standards.

## III

Creech argues alternatively that the "utter disregard" circumstance, even if facially valid, does not apply to him. He suggests—as did the Court of Appeals and as does the dissent, *post,* at 488—that the trial judge's findings that he was provoked and that he exhibited an "excessive violent rage" are irreconcilable with a finding of "utter disregard." The Idaho Supreme Court, Creech claims, did not cure the error on appeal. There also appears to be some question whether the other murders that Creech has committed, and the self-defense explanations he has offered for some of them, bear on the "utter disregard" determination. See Tr. of Oral Arg. 5–7, 18–21; cf. *post,* at 488, n. 15.

These are primarily questions of state law. As we said in *Jeffers,* a state court's application of a valid aggravating circumstance violates the Constitution only if "no reasonable sentencer" could find the circumstance to exist. 497 U. S., at 783. The Court of Appeals had no occasion to decide the *Jeffers* issue in this case, since it found the "utter disregard" circumstance facially vague. The posture of the case, moreover, makes it unnecessary for us to reach the remaining arguments. The Court of Appeals granted Creech relief on two other claims: that the trial judge improperly refused to allow him to present new mitigating evidence when he was resentenced in open court, and that the judge applied two aggravating circumstances without making a finding required under state law. See 947 F. 2d, at 881–882. On the

basis of the first claim, Creech is entitled to resentencing in state trial court. *Id.*, at 882. Accordingly, we hold today only that the "utter disregard" circumstance, as defined in *Osborn*, on its face meets constitutional requirements. The judgment of the Court of Appeals is therefore reversed in part, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE STEVENS joins, dissenting.

Confronted with an insupportable limiting construction of an unconstitutionally vague statute, the majority in turn concocts its *own* limiting construction of the state court's formulation. Like "nonsense upon stilts,"[1] however, the majority's reconstruction only highlights the deficient character of the nebulous formulation that it seeks to advance. Because the metaphor "cold-blooded" by which Idaho defines its "utter disregard" circumstance is both vague and unenlightening, and because the majority's recasting of that metaphor is not dictated by common usage, legal usage, or the usage of the Idaho courts, the statute fails to provide meaningful guidance to the sentencer as required by the Constitution. Accordingly, I dissent.

I

I discuss the applicable legal standards only briefly, because, for the most part, I agree with the majority about what is required in a case of this kind. As the majority acknowledges, *ante*, at 474, "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant* v. *Stephens*, 462 U. S. 862,

---

[1] J. Bentham, Anarchical Fallacies, in 2 Works of Jeremy Bentham 501 (1843).

877 (1983). A state court's limiting construction can save a flawed statute from unconstitutional vagueness, and where the sentencer is a judge there is nothing wrong with "presum[ing] that the judge knew and applied any existing narrowing construction." *Ante,* at 471. "The trial judge's familiarity with the State Supreme Court's opinions, however, will serve to narrow his discretion only if that body of case law articulates a construction of the aggravating circumstance that is coherent and consistent, and that meaningfully limits the range of homicides to which the aggravating factor will apply." *Walton* v. *Arizona,* 497 U. S. 639, 692 (1990) (dissenting opinion). We have "plainly rejected the submission that a particular set of facts surrounding a murder, however shocking they might be, were enough in themselves, and without some narrowing principle to apply to those facts, to warrant the imposition of the death penalty." *Maynard* v. *Cartwright,* 486 U. S. 356, 363 (1988). A limiting construction must do more than merely invite the sentencer to assess in some indeterminate way the circumstances of each case. *Clemons* v. *Mississippi,* 494 U. S. 738, 757–761 (1990) (opinion concurring in part and dissenting in part). The source of this requirement is the paramount need to " 'make rationally reviewable the process for imposing a sentence of death.' " *Godfrey* v. *Georgia,* 446 U. S. 420, 428 (1980) (plurality opinion), quoting *Woodson* v. *North Carolina,* 428 U. S. 280, 303 (1976) (plurality opinion).

II

The Idaho Supreme Court has determined that under our cases Idaho's statutory phrase, "utter disregard for human life," requires a limiting construction, see *State* v. *Osborn,* 102 Idaho 405, 418, 631 P. 2d 187, 200 (1981); *Sivak* v. *State,* 112 Idaho 197, 209, 731 P. 2d 192, 204 (1986), and petitioner does not challenge the Court of Appeals' conclusion that the phrase, unadorned, fails to meet constitutional standards. This is understandable. Every first-degree murder will demonstrate a lack of regard for human life, and there is no

cause to believe that some murders somehow demonstrate only partial, rather than "utter" disregard. Nor is there any evidence that the phrase is intended to have a specialized meaning—other than that presented by the Idaho Supreme Court in its limiting constructions—that might successfully narrow the eligible class. The question is whether *Osborn*'s limiting construction saves the statute.[2]

Under *Osborn*, an offense demonstrates "utter disregard for human life" when the "acts or circumstances surrounding the crime . . . exhibit the highest, the utmost, callous disregard for human life, i. e., the cold-blooded, pitiless slayer." 102 Idaho, at 419, 631 P. 2d, at 201. Jettisoning all but the term, "cold-blooded," the majority contends that this cumbersome construction clearly singles out the killing committed "without feeling or sympathy." *Ante*, at 476. As an initial matter, I fail to see how "without feeling or sympathy" is meaningfully different from "devoid of . . . mercy or compassion"—the definition of "pitiless" that the majority concedes to be constitutionally inadequate. See *ante*, at 471.

Even if there is a distinction, however, the "without feeling or sympathy" test, which never has been articulated by any Idaho court, does not flow ineluctably from the phrase at issue in this case: "cold-blooded." I must stress in this regard the rather obvious point that a "facial" challenge of this nature—one alleging that a limiting construction provides inadequate guidance—cannot be defeated merely by a dem-

---

[2] Of course, even if the phrase "utter disregard" were narrowing and clear, a purported limiting construction from the State's high court that actually undid any narrowing or clarity would render the statute unconstitutional. For example, if the statute allowed the death sentence where the murder was committed for pay, but an authoritative construction from the State Supreme Court told trial courts that the statute covered every murder committed for "bad reasons," the state scheme would be unconstitutional. In the present case, any clarity that may be imparted, and any channeling that may be done by the phrase, "utter disregard for human life," is destroyed by the boundless and vague *Osborn* construction adopted as the authoritative interpretation of the statute.

onstration that there exists a narrowing way to apply the contested language. The entire point of the challenge is that the language's susceptibility to a *variety* of interpretations is what makes it (facially) unconstitutional. To save the statute, the State must provide a construction that, on its face, reasonably can be expected to be applied in a consistent and meaningful way so as to provide the sentencer with adequate guidance. The metaphor "cold-blooded" does not do this.

I begin with "ordinary usage." The majority points out that the first definition in Webster's Dictionary under the entry "cold-blooded" is "'marked by absence of warm feelings: without consideration, compunction, or clemency.'" *Ante,* at 472, quoting Webster's Third New International Dictionary 442 (1986). If Webster's' rendition of the term's ordinary meaning is to be credited, then Idaho has singled out murderers who act without warm feelings: those who act without consideration, compunction, or clemency. Obviously that definition is no more illuminating than the adjective "pitiless" as defined by the majority. What murderer *does* act with consideration or compunction or clemency?[3]

In its eagerness to boil the phrase down to a serviceable core, the majority virtually ignores the very definition it cites. Instead, the majority comes up with a hybrid all its own—"without feeling or sympathy"—and then goes one step further, asserting that because the term "cold-blooded" so obviously means "without feeling," it cannot refer as ordinarily understood to murderers who "kill with anger, jealousy, revenge, or a variety of other emotions." *Ante,* at 476. That is incorrect. In everyday parlance, the term "cold-blooded" *routinely* is used to describe killings that fall outside the majority's definition. In the first nine weeks of this

---

[3] Cf. *State* v. *Charboneau,* 116 Idaho 129, 172, 774 P. 2d 299, 342 (1989) (Bistline, J., dissenting) ("What first degree murderer fails to show 'callous disregard for human life'? I suppose this would be the 'pitiful' slayer, who, prior to delivering the fatal blow, tells the victim, 'Excuse me, pardon me, I know it's inconvenient, but I must now take your life'").

year alone, the label "cold-blooded" has been applied to a murder by an ex-spouse angry over visitation rights,[4] a killing by a jealous lover,[5] a revenge killing,[6] an ex-spouse "full of hatred,"[7] the close-range assassination of an enemy official by a foe in a bitter ethnic conflict,[8] a murder prompted by humiliation and hatred,[9] killings by fanatical cult members,[10] a murderer who enjoyed killing,[11] and, perhaps most appro-

---

[4] See Kuczka, Self-Defense Claimed in Murder Trial, Chicago Tribune, Feb. 3, 1993, p. 5 ("To prosecutors, Eric Moen is a cold-blooded killer who gunned down his wife's former boyfriend in a Streamwood restaurant parking [lot] during a quarrel over visitation rights to the ex-boyfriend's infant daughter").

[5] See Caba, Friedman Prosecutor Rebuffed, Philadelphia Inquirer, Feb. 19, 1993, p. B3 ("The prosecution contends she killed Edwards in cold blood because he was leaving [her] to return to his wife in Texas").

[6] See McMahon, Dad Does Everything Right, But Son Goes Wrong, Chicago Tribune, Mar. 7, 1993, p. 1 (youth who, according to charges, killed victim after saying "he was going to kill him in retaliation for something [the victim] had done" is, "the state reminds, a cold-blooded killer").

[7] See Gorman, Millionaire Guilty of Killing Ex-Wife, Chicago Tribune, Feb. 3, 1993, p. 1 ("Assistant State's Atty. Robert Egan portrayed Davis as a 'manipulative,' cold-blooded killer . . . . Egan depicted Davis as a man so filled with hatred that he killed Diane Davis two weeks after an Illinois Appellate Court had ruled . . . that he must turn over $1.4 million of his inherited money to his former spouse").

[8] See Burns, U. N. to Ask NATO to Airdrop Supplies for Bosnians, N. Y. Times, Jan. 12, 1993, p. A10 (shooting of Bosnian Deputy Prime Minister by Serbian soldier was described by State Department spokesman Richard A. Boucher as "cold-blooded" murder).

[9] See Man Gets Life For Double Murder, Toronto Star, Mar. 4, 1993, p. A12 (the prosecution "called it 'a cold-blooded killing' spurred by [the defendant's] 'humiliation and hate of these people,' with whom he had squabbled during the 1991 mayoralty campaign").

[10] See McKay, Koresh "Smiled Defiantly" Before Ambush, Agent Says, Houston Chronicle, Mar. 5, 1993, p. A1 ("'These people aren't religious. These people are cold-blooded killers who were shooting at us from every window in that place'").

[11] See Milling, Man Charged in 2 Slayings, Crime Spree, Houston Chronicle, Mar. 5, 1993, p. A23 ("'I'd describe him as a psychopath who gets his gratification by hurting other people,' Carroll said. 'He's not your typical serial killer. He just likes to pull the trigger and watch people die.' . . . 'We knew this guy was a cold-blooded killer,' Carroll said").

priately, *all* murders.[12]   All these killings occurred with
"feelings" of one kind or another.   All were described as
cold-blooded.   The majority's assertion that the Idaho con-
struction narrows the class of capital defendants because it
rules out those who "kill with anger, jealousy, revenge, or a
variety of other emotions" clearly is erroneous, because in
ordinary usage the nebulous description "cold-blooded" sim-
ply is not limited to defendants who kill without emotion.

In legal usage, the metaphor "cold blood" does have a spe-
cific meaning.   "Cold blood" is used "to designate a willful,
deliberate, and premeditated homicide."   Black's Law Dic-
tionary 260 (6th ed. 1990).   As such, the term is used to dif-
ferentiate between first- and second-degree murders.[13]   For
example, in *United States* v. *Frady,* 456 U. S. 152 (1982), JUS-

---

[12] See Longenecker, Penalizing Convicts, Chicago Tribune, Mar. 4, 1993,
p. 28 (letter) ("[L]egislation to expand the death penalty to include all
convicted murderers is long needed. . . . [I]f an individual commits cold-
blooded murder he should be removed from our society").

[13] The line between the "ordinary" and the "legal" meaning of cold-
blooded, however, is not always obvious.   On the one hand, judges some-
times casually use the phrase in a variety of senses.   In those circum-
stances, contrary to the majority's assumptions, the term regularly is
applied to crimes committed "with anger, jealousy, revenge, or a variety
of other emotions."   See, *e. g., McWilliams* v. *Estelle,* 378 F. Supp. 1380,
1383 (SD Tex. 1974) ("It was the theory of the prosecution that the store
owner refused to serve petitioner, that he became angry, went to his hotel
room, returned with a pistol, and shot the owner in cold blood"), appeal
dism'd, 507 F. 2d 1278 (CA5 1975); *People* v. *Sullivan,* 183 Ill. App. 3d 175,
180, 538 N. E. 2d 1376, 1380 (1989) (the defendant "exhibited repeatedly a
very jealous, violent nature. . . . The trial court concluded that if the situa-
tion were to arise again, defendant in all probability would kill in cold
blood again"); *People* v. *Yates,* 65 Ill. App. 3d 319, 325, 382 N. E. 2d 505,
510 (1978) ("This record reveals a concerted, deliberate attack by Shirley
and Emma Yates against their victim, motivated . . . by cold-blooded re-
venge").   On the other hand, in ordinary parlance the term "cold-blooded"
sometimes is used to mean "premeditated."   See, *e. g.,* Reward Offered in
Slaying of 2 Women in Shadow Park, Los Angeles Times, Jan. 21, 1993,
p. J2 (quoting mayor's statement: " 'This was one of those in-cold-blood
killings, not just a drive-by or random shooting.   It was premeditated' ").

TICE O'CONNOR, writing for the Court, described the District of Columbia's homicide statute: "'In homespun terminology, intentional murder is in the first degree if committed in cold blood, and is murder in the second degree if committed on impulse or in the sudden heat of passion.'" *Id.*, at 170, n. 18, quoting *Austin* v. *United States*, 127 U. S. App. D. C. 180, 188, 382 F. 2d 129, 137 (1967). Murder in cold blood is, in this sense, the opposite of murder in "hot blood." Arguably, then, the *Osborn* formulation covers every intentional or first-degree murder. An aggravating circumstance so construed would clearly be unconstitutional under *Godfrey.*

Finally, I examine the construction's application by the Idaho courts. The majority acknowledges the appropriateness of examining "other state decisions when the *construction* of an aggravating circumstance has been unclear," such as where state courts have not adhered to a single limiting construction. *Ante,* at 477. Here, however, the majority believes such an inquiry is "irrelevant," *ante,* at 476, because "there is no question that Idaho's formulation of its limiting construction has been consistent," *ante,* at 477. The majority misses the point. Idaho's application of the *Osborn* formulation is relevant not because that formulation has been inconsistently invoked, but because the construction has never meant what the majority says it does. In other words, it is the majority's reconstruction of the (unconstitutional) construction that has not been applied consistently (or ever, for that matter). If, for example, a State declared that "jaberwocky" was an aggravating circumstance, and then carefully invoked "jaberwocky" in every one of its capital cases, this Court could not simply decide that "jaberwocky" means "killing a police officer" and then dispense with any inquiry into whether the term ever had been understood in that way by the State's courts, simply because the "jaberwocky" construction consistently had been reaffirmed.

An examination of the Idaho cases reveals that the *Osborn* formulation is not much better than "jaberwocky." As

noted above, the Idaho courts never have articulated anything remotely approaching the majority's novel "those who kill without feeling or sympathy" interpretation. All kinds of other factors, however, have been invoked by Idaho courts applying the circumstance. For example, in *State* v. *Aragon*, 107 Idaho 358, 690 P. 2d 293 (1984), the killer's cold-bloodedness supposedly was demonstrated by his refusal to render aid to his victim and the fact that "[h]is only concern was to cover up his own participation in the incident." *Id.*, at 367, 690 P. 2d, at 302. In *State* v. *Pizzuto*, 119 Idaho 742, 774, 810 P. 2d 680, 712 (1991), a finding of "utter disregard" was held to be supported by evidence that the defendant "approached Mr. Herndon with a gun, then made him drop his pants and crawl into the cabin where he proceeded to bludgeon the skulls of both of his victims with a hammer. He then left them lying on the floor to die and Mr. Herndon was left lying on the floor of the cabin convulsing." And, in the present case, the trial judge's determination that Creech exhibited utter disregard for human life appears to have been based primarily on the fact that Creech had "intentionally destroyed another human being at a time when he was completely helpless." App. 34. Each of these characteristics is frightfully deplorable, but what they have to do with a lack of emotion—or with each other, for that matter— eludes me. Without some rationalizing principle to connect them, the findings of "cold-bloodedness" stand as nothing more than fact-specific, "gut-reaction" conclusions that are unconstitutional under *Maynard* v. *Cartwright*, 486 U. S. 356 (1988).

The futility of the Idaho courts' attempt to bring some rationality to the "utter disregard" circumstance is glaringly evident in the sole post-*Osborn* case that endeavors to explain the construction in any depth. In *State* v. *Fain*, 116 Idaho 82, 774 P. 2d 252, cert. denied, 493 U. S. 917 (1989), the court declared that the "utter disregard" factor refers to "the defendant's lack of conscientious scruples against killing

another human being." *Id.*, at 99, 744 P. 2d, at 269. Accord, *State* v. *Card*, 121 Idaho 425, 436, 825 P. 2d 1081, 1092 (1991). Thus, the latest statement from the Idaho Supreme Court on the issue says nothing about emotionless crimes, but, instead, sweepingly includes every murder committed that is without " 'conscientious scruples against killing.' " I can imagine no crime that would not fall within that construction.

Petitioner in his brief embraces *Fain*'s broad construction. "In every case in which the Idaho Supreme Court has upheld a death sentence based wholly or in part on a finding of utter disregard for human life, the defendant had acted without conscientious scruple against killing." Brief for Petitioner 25. Petitioner cites this reassuring fact as the "best evidence that Idaho's utter disregard factor is not so broad that it operates simply as a catch-all for murders not covered by other aggravating circumstances." *Id.*, at 24. This "best evidence" is not very good evidence, especially when viewed against the fact that the Idaho Supreme Court never has reversed a finding of utter disregard.[14] Equally unsettling is petitioner's frank admission that the *Osborn* construction "does not make findings of the aggravating factors depend on the presence of particular facts. Instead Idaho has chosen to rely on the ability of the sentencing judge to make principled distinctions between capital and non-capital cases

---

[14] The State suggests in its brief that on one occasion the Idaho Supreme Court found that the evidence did not support an utter disregard finding. Brief for Petitioner 27, citing *State* v. *Charboneau*, 116 Idaho 129, 774 P. 2d 299 (1989). It is not at all clear, however, that that is what occurred in *Charboneau*. The court there vacated a sentence because it was "unclear from the [trial court's] Findings whether the trial court would have imposed the death penalty without having [mistakenly] concluded that [the victim] was not mortally wounded until the second volley of shots was fired." *Id.*, at 151, 774 P. 2d, at 321. There is no mention in this part of the opinion of the "utter disregard" factor, nor any suggestion that the erroneous finding tainted the "utter disregard" factor rather than the "heinous, atrocious, and cruel" circumstance that was at issue in that case.

with guidance that is somewhat subjective . . . ." Brief for Petitioner 9. That kind of gestalt approach to capital sentencing is precisely what *Cartwright* and *Godfrey* forbid.

Ultimately, it hardly seems necessary to look beyond the record of this case to determine that either the majority's construction is inadequate, or that there was insufficient evidence to support the "utter disregard" factor here. The record, which the majority takes pains to assure us "could not be more chilling," *ante*, at 465,[15] includes an explicit finding by the trial judge that Creech was the subject of an unprovoked attack and that the killing took place in an "excessive violent rage." App. 52. If Creech somehow is covered by the "utter disregard" factor as understood by the majority (one who kills not with anger, but indifference, *ante*, at 476), then there can be no doubt that the factor is so broad as to cover any case. If Creech is not covered, then his sentence was wrongly imposed.

### III

Let me be clear about what the majority would have to show in order to save the Idaho statute: that, on its face, the *Osborn* construction—"the highest, the utmost, callous disregard for human life, *i. e.*, the cold-blooded, pitiless slayer"—refers *clearly* and *exclusively* to crimes that occur "without feeling or sympathy," that is, to those that occur

---

[15] I note that much of the majority's discussion of the "facts underlying this case" centers on Creech's *other* crimes—which obviously do not bear on whether "[b]y the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life"—and on the argument, repeatedly rejected by the state courts, that Creech engineered the fight with Jensen in order to create a pretext for killing him. The Idaho Supreme Court explicitly noted that the trial court did not "find that the murder had been performed on contract or by plan." *State* v. *Creech*, 105 Idaho 362, 364, 670 P. 2d 463, 465 (1983), cert. denied, 465 U. S. 1051 (1984). In fact, the trial court not only found that Jensen's attack was "unprovoked," but it went further and found that the unprovoked nature of the attack actually constituted a *mitigating* factor. See App. 52.

without "anger, jealousy, revenge, or a variety of other emotions." No such showing has been made.

There is, of course, something distasteful and absurd in the very project of parsing this lexicon of death. But as long as we are in the death business, we shall be in the parsing business as well. Today's majority stretches the bounds of permissible construction past the breaking point. "'Vague terms do not suddenly become clear when they are defined by reference to other vague terms,'" *Walton* v. *Arizona*, 497 U. S., at 693–694, n. 16 (dissenting opinion), quoting *Cartwright* v. *Maynard*, 822 F. 2d 1477, 1489 (CA10 1987), nor do sweeping categories become narrow by mere restatement. The *Osborn* formulation is worthless, and neither common usage, nor legal terminology, nor the Idaho cases support the majority's attempt to salvage it. The statute is simply unconstitutional and Idaho should be busy repairing it.

I would affirm the judgment of the Court of Appeals.