

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-75,477

**JOE FRANCO GARZA, JR., Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 99-429,839
### IN THE 137TH DISTRICT COURT
### LUBBOCK COUNTY

MEYERS, J., delivered the opinion of the Court, in which KELLER, P.J., and PRICE, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined. WOMACK and JOHNSON, JJ., concurred.

### O P I N I O N

Appellant was convicted in April 2000 of capital murder committed on December 31, 1998. TEX. PENAL CODE ANN. § 19.03(a)(2). Based on the jury's answers to the special issues set forth in the Texas Code of Criminal Procedure, Article 37.071, sections

2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071, § 2(g).[1] This Court affirmed appellant's conviction and sentence on direct appeal. *Garza v. State,* No. AP-73,850 (Tex. Crim. App. Sept. 18, 2002) (not designated for publication). This Court denied relief on his Article 11.071 application for a writ of habeas corpus. *Ex parte Garza,* No. WR-56,961-01 (Tex. Crim. App. Oct. 22, 2003). He then filed an application for a writ of habeas corpus in federal district court, where relief was granted on his claim of ineffective assistance of counsel for failing to obtain and use mitigating evidence at punishment. The federal district court vacated his death sentence and remanded the case to the trial court with instructions to conduct a new punishment hearing or to impose a life sentence. *Garza v. Dretke,* No. 5:03-CV-284-C (N.D. Tex.–Lubbock Aug. 31, 2005). Following a new punishment hearing, based on the jury's answers to the special issues, the trial court again sentenced appellant to death on April 24, 2006. Direct appeal to this Court is automatic. Art. 37.071, § 2(h). After reviewing appellant's fourteen points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## FUTURE DANGEROUSNESS

In appellant's ninth point of error, he argues that the evidence is legally insufficient to support an affirmative finding on the issue of future dangerousness. When reviewing the future-dangerousness special issue, we view the evidence in the light most

---

[1] Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

favorable to the verdict and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. *See Wardrip v. State,* 56 S.W.3d 588 (Tex. Crim. App. 2001). In some cases, the circumstances of the offense "can be among the most revealing evidence of future dangerousness and alone may be sufficient to support an affirmative answer to that special issue." *Id.* (quoting *Wilson v. State,* 7 S.W.3d 136, 142 (Tex. Crim. App. 1999)).

Here, the jury heard that appellant had been drinking at his cousin's house when someone there called the 71-year-old victim, Silbiano Rangel, and asked him to come over. Rangel gave appellant and his cousin a ride to a liquor store to buy beer. After they got to the store, appellant and his cousin realized that they had no money. Rangel then drove them to the house of a friend, where appellant's cousin went inside to try to borrow money. While she was in the house, appellant, who was sitting behind Rangel, strangled him with a sock. When his cousin returned to the truck, appellant ordered her to help him move Rangel's body into the back of the truck. He took Rangel's wallet, jewelry, and truck, and he dropped his cousin off at her friend's house. He drove the stolen truck to the house of his 13-year-old pregnant girlfriend, where he lied to Rangel's friend who noticed the truck and asked about Rangel. He then woke his girlfriend and took her with him to Dallas in Rangel's truck, stopping along the way to pawn Rangel's ring and make purchases with Rangel's checks. While in Dallas he gave or sold the truck to a stranger

and borrowed money from a friend. He and his girlfriend returned by bus to Lubbock. Later, he bought a newspaper and read it to see if there had been a report of Rangel's death.

The morning after the murder, Rangel's body was found on the side of the road with the sock still tied around his neck. There was testimony that Rangel's injuries were consistent with him having struggled before he died. The medical examiner testified that injuries on Rangel's face were consistent with blunt force trauma.

Appellant's prior juvenile adjudications included burglary and arson. He had been belligerent to a police officer who had stopped a stolen car in which appellant was a passenger. He had attempted to escape from the juvenile justice center by kicking out the windows, and he had fought with the responding officers. He was arrested for carrying a homemade dagger when he was seventeen years old. As an adult, appellant had been arrested for public intoxication more than once. There was evidence that he had assaulted his girlfriend's sister by punching her in the face and then chasing her to a closet. He broke down the closet door and then kicked her repeatedly as she lay on the closet floor. He did not stop until the police arrived, and then he fled the house. He had stolen a car, guitar, and leather jacket from a man who had given him a ride in the rain. The records introduced by the State revealed that by the time of the instant offense, appellant had been adjudicated delinquent as a juvenile or convicted as an adult of several offenses including burglary, criminal mischief, theft, arson, evading arrest, resisting arrest, attempted escape,

and aggravated robbery. Appellant was on parole from a burglary conviction when he committed the instant offense.

Appellant's prison disciplinary record included numerous disciplinary violations, such as possessing homemade weapons, assaulting inmates, and verbally threatening and verbally abusing corrections officers. One inmate that he assaulted required seventeen stitches after the attack. Another disciplinary violation involved throwing hot water at a corrections officer. In addition, appellant had been investigated as a possible prison-gang member in 1994 and 1995. During an interview that was conducted as part of that investigation, appellant did not admit to being a gang member, but he told gang-intelligence officers that if the San Antonio inmates were not shipped off the unit, they would be "shipped off in coffins." Although appellant's gang membership was not confirmed at that time, the Security Threat Group ("STG") management office of the Texas Department of Criminal Justice ("TDCJ") later confirmed appellant as a Texas Syndicate ("TS") gang member.

The evidence presented at trial was such that a rational jury could find beyond a reasonable doubt that there was a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. We hold the evidence to be legally sufficient to support the jury's answer to the future-dangerousness special issue. Point of error nine is overruled.

VOIR DIRE

In his first six points of error, appellant complains of trial court errors during individual jury voir dire. In points one, two, and four through six, he alleges error in the trial court's denying his challenges for cause to prospective jurors. Appellant sufficiently preserved these points for appellate review. *See Saldano v. State,* 232 S.W.3d 77, 91 (Tex. Crim. App. 2007), *cert. denied,* 128 S. Ct. 1446 (2008).

In appellant's first point of error, he argues that the trial court erred when it denied his challenge for cause against prospective juror Gerald Smith, thereby violating his rights under the Fifth and Fourteenth Amendments to the United States Constitution, Article 1, sections 13 and 19 of the Texas Constitution, and Article 35.16(c)(2) of the Texas Code of Criminal Procedure. Appellant argues that Smith responded in the affirmative when defense counsel asked him whether the fact that appellant had been convicted of capital murder was some evidence of future dangerousness, such that appellant would be "starting out a little behind." Appellant further asserts that Smith stated that he might not be able to follow the court's charge that he was not to consider the possibility of parole.

When reviewing a trial court's decision to grant or deny a challenge for cause, we look at the entire record to determine if there is sufficient evidence to support the court's ruling. We give great deference to the trial court's decision because the trial judge is present to observe the demeanor of the prospective juror and to listen to his tone of voice. *See Feldman v. State,* 71 S.W.3d 738, 744 (Tex. Crim. App. 2002). The proponent of a challenge for cause has the burden of establishing that his challenge is proper. The

proponent does not meet his burden until he has shown that the prospective juror understood the requirement of the law and could not overcome his prejudice well enough to follow it. *Id.* at 747.

A juror who would automatically say "life" or "death" without knowing more than the fact of conviction, or who would not be able to consider all the evidence in making a decision as to which punishment to impose, is challengeable for cause because he is not impartial. *See Morgan v. Illinois,* 504 U.S. 719, 729 (1992). Any prospective juror who would automatically answer the future-dangerousness special issue in the affirmative, or who would place the burden of proof on the defense, is challengeable for cause under Article 35.16(c)(2) for having a bias or prejudice against a law applicable to the case upon which the defense is entitled to rely. *See Ladd v. State,* 3 S.W.3d 547, 559 (Tex. Crim. App. 1999). It is not error on the part of the trial court to deny a challenge for cause to a prospective juror who gives equivocal answers on whether he would automatically say "yes" to one of the punishment issues. *Ladd,* 3 S.W.3d at 559; *Banda v. State,* 890 S.W.2d 42, 55 (Tex. Crim. App. 1994).

Here, Smith stated that he understood the word "probability," as part of the future-dangerousness special issue, to mean "possibility." He responded affirmatively when defense counsel asked him whether the defense would be starting out "a little bit behind" because of the fact that appellant had already been convicted of capital murder committed during the course of robbery. After defense counsel explained that "probability" meant

"more likely than not," Smith continued to indicate that the fact that appellant had already been convicted of capital murder would have some influence or evidentiary value in his consideration of the future-dangerousness special issue.

Concerning parole eligibility, Smith stated that he did not know how the knowledge that the defendant would be eligible for parole in forty years would affect his deliberations.[2]  Initially, he indicated that he would not be able to follow an instruction not to consider the issue of parole.  However, he then indicated that the issue of parole would not influence how he voted on the special issues and would not cause him to make sure that the defendant received a death sentence.  He affirmed on redirect that the parole issue would not influence him and cause him to answer the special issues in such a way as to impose a death sentence.

The trial court did not abuse its discretion in denying appellant's challenge for cause to Smith.  His responses did not show that he would automatically answer the future-dangerousness issue in the affirmative.  The fact that appellant had been convicted of capital murder committed during the course of a robbery was a factor that Smith could, but was not required to, consider in determining punishment.  *Cf. Standefer v. State,* 59 S.W.3d 177, 179 (Tex. Crim. App. 2001); *see also Sadler v. State,* 977 S.W.2d 140, 143 (Tex. Crim. App. 1998).  Smith's responses concerning whether he would be able to

---

[2]  For crimes committed prior to September 1, 1999, parole was not a proper consideration for the jury in a capital case. *Ford v. State,* 919 S.W.2d 107, 116 (Tex. Crim. App. 1996).

follow an instruction not to consider the possibility of parole were equivocal. Point of error one is overruled.

In appellant's second point of error, he argues that the trial court erred when it denied his challenge for cause against prospective juror Juan Camacho. Appellant argues that Camacho lacked the intellectual capacity to understand the legal concepts involved and that he had a limited understanding of the English language.

Defense counsel questioned Camacho about specific terms that would be included in the issues submitted to the jury. Concerning "probability," Camacho first stated, "To me, it's somebody's opinion." When pressed further, he stated, "All right, they have done something. Do you think they're going to do it again?" When asked to define a "criminal act of violence," Camacho stated, "anything – not obeying the law." As to "society," Camacho stated, "Society is where we're living in right now." Counsel asked, "All of us?" and Camacho answered, "Yes." Asked to define "personal moral culpability," he offered, "Whatever you would think. I mean, your thoughts about the –" at which point counsel interjected, "You mean a juror's opinion about a person's morals?" and Camacho responded affirmatively. When questioned about "mitigating," Camacho stated that he really did not know what "mitigating" meant. Counsel then asked him whether he could read and write and how far he had gone through school. He responded that he could read and write and that he had graduated from Lubbock High School. When counsel asked him again about the meaning of "personal moral culpability" and "mitigating," Camacho

indicated that he did not "catch" all of the question but that he thought the question was asking why the defendant committed the crime.

Counsel then challenged Camacho for cause based on Article 35.16(a)(5):

[I]n that his answers to these questions indicate that he lacks the capacity and sophistication to understand the legal concepts discussed and that will be submitted in the special issues. He does not understand the terms that will be submitted by the Court in the Charge. And, as a result, within the definition of Section 5 of Article 36.16 [sic], he is not fit for jury service because of his limited understanding of the English language.

Further, Your Honor, to permit a person of this limited understanding of the legal concepts involved to serve would deny the Defendant due process of law in violation of the 5th and 14th Amendment to the Constitution of the United States, and would deny him due course of law in violation of Article 1, Sections 13 and 19 of the Texas Constitution.

He just doesn't have the sophistication or understanding of the legal terms to be fit for service, Your Honor.

Article 35.16(a)(5) provides that a challenge for cause may be made by either the state or the defense for the reason that:

[T]he juror has such defect in the organs of feeling or hearing, or such bodily or mental defect or disease as to render the juror unfit for jury service, or that the juror is legally blind and the court in its discretion is not satisfied that the juror is fit for jury service in that particular case[.]

A "mental defect" may be present when the prospective juror's responses show an inability to understand the jury's role in capital proceedings. *Matamoros v. State,* 901 S.W.2d 470, 476 (Tex. Crim. App. 1995).

The trial court did not abuse its discretion in denying appellant's challenge for cause. Camacho's answers to the questions posed by defense counsel indicated that he

was not familiar with some of the terms that would be included in the issues submitted to the jury. However, counsel did not attempt to explain the law to him and ascertain whether he could understand it. Without more, Camacho's lack of familiarity with certain terms does not establish that Camacho was unable to comprehend his duties as a juror. The record does not show that he had such a mental defect as to render him unfit for jury service. Point of error two is overruled.

In appellant's fourth point of error, he argues that the trial court erred when it denied his challenge for cause against prospective juror Earlinda Vickers.[3] He argues that she would have found him to be a future danger based solely on the fact of his having been convicted of capital murder unless he presented evidence that he would not be a future danger. He also argues that she shifted the burden to the defense on the mitigation special issue.

Concerning the future-dangerousness special issue, Vickers initially responded in the affirmative when defense counsel asked her if she would want to hear something from defendant or his attorneys to convince her that defendant would not be dangerous. Concerning mitigation, she stated that after answering the future-dangerousness and anti-parties special issues in the affirmative, she would have to hear more in order to determine how to answer the mitigation special issue. When defense counsel asked her if she would have to hear testimony or evidence from the defense before she could answer

---

[3] In his brief, appellant lists this prospective juror's name as "Earlinda Vick," but the record on appeal indicates the name of "Earlinda Vickers."

the mitigation special issue affirmatively, she responded that she would. Counsel then asked her whether her determination of future dangerousness would be influenced by the fact that she had already found the defendant guilty of capital murder, and she responded that it would.

On redirect, Vickers agreed with the prosecutor that she would not automatically find a defendant to be a future danger just because he had already been convicted. She responded affirmatively when the prosecutor asked her whether it would depend on the evidence. She stated that she could not foresee a set of circumstances where she would not answer the future-dangerousness special issue affirmatively after finding a defendant guilty of capital murder, but then she stated that she could see such a set of circumstances where she could answer the questions in such a way as to impose a life sentence. In response to further questioning, Vickers stated that she could answer the future-dangerousness special issue in the negative if the circumstances were right. When the prosecutor asked her if she would always answer "yes" to the future-dangerousness issue or if it would depend on the evidence, she stated that it would depend on the evidence. Vickers gave a similar response when asked about the mitigation special issue. After the prosecutor explained to her that the State had the burden of proof on future dangerousness, Vickers affirmed that she would not hold it against the defense if the defense did not present any evidence. Counsel challenged Vickers for cause, arguing that she was an automatic vote on the future-dangerousness special issue and that she was

"mitigation impaired."

The trial court did not abuse its discretion in denying appellant's challenge for cause against Vickers. The fact that appellant had been convicted of capital murder was a factor that Vickers properly could consider in determining punishment. She initially stated that, in deciding whether appellant would be a future danger, she would be influenced by the fact that he had been convicted of capital murder, but she also stated that she would not automatically answer the future dangerousness question in the affirmative and that her answer would depend on the evidence. Although she could not immediately foresee a set of circumstances where she would not answer the future-dangerousness special issue affirmatively after finding a defendant guilty of capital murder, she later stated that she could answer the future dangerousness special issue negatively if the circumstances were right. Where Vickers's responses were equivocating, the trial court did not abuse its discretion by denying appellant's challenges for cause. Point of error four is overruled.

In appellant's fifth point of error, he argues that the trial court erred when it denied appellant's challenge for cause against prospective juror Charlene Sport. Appellant argues that his challenge should have been granted because Sport wanted appellant's lawyers to present some kind of evidence before she could consider a life sentence.

Initially, concerning the mitigation special issue, Sport responded in the affirmative when counsel asked whether she would expect and want the defense to put on

evidence before she could consider a life sentence. However, when the prosecutor asked her whether she would consider anything she perceived to be mitigating even if the defense had not presented it, and whether under those circumstances she could consider a life sentence, she agreed that she would. When counsel asked her to elaborate on her earlier statement about wanting to hear from the defense, she explained that she would want to hear from the defense to understand "where [the defendant] was at the time he committed the crime" in order to make a good decision on whether he deserved to live or die. When counsel asked if she meant that she would want to understand the defendant's thought processes, she responded affirmatively.

The trial court did not abuse its discretion in denying appellant's challenge for cause against Sport. Although initially she indicated that she would want to hear from the defense before she would be willing to consider a life sentence, she then agreed that she could consider a life sentence if she became aware of mitigating evidence, even though the lawyers for the defense had not spoken up. Where the juror's answers were equivocating, she would not have been subject to a challenge for cause. Point of error five is overruled.

In appellant's sixth point of error, he argues that the trial court erred when it denied his challenge for cause against prospective juror Dale Smith. Appellant argues that his challenge should have been granted because Smith said he would lean toward the death penalty after finding a person guilty of capital murder. He argues that Smith also

said that the defense would need to persuade him in some way to assess a life sentence rather than death. He admits that the State secured Smith's acknowledgment that the State would have to prove to him that the defendant needed to be put to death.

The State initially asked Smith, "[W]ould you require the defense to put on evidence before you could answer those questions in such a way that a life sentence was imposed?" He replied, "I think they would have to do something before I could answer some of them." After the prosecutor explained the burden of proof, Smith agreed that he would not hold the defense's failure to present evidence against appellant and that he would not require the defense to put on evidence before he could answer the questions in such a way as to impose a life sentence. During cross examination, he conceded that he would be curious about the defendant's side of the case if he did not testify. Smith stated that if the defense did not present any evidence, he could follow the law and consider a life sentence, but he might be wondering in the back of his mind why the defense did not do anything. He clarified that he would not demand a defense and he could probably set it aside, although he would be curious as to why the defense had not done anything.

When questioned about the mitigation special issue, Smith responded affirmatively when defense counsel asked him whether, after a defendant had been found guilty of capital murder with no defenses and no justification, he would "lean toward the death penalty." When counsel asked him whether it would be necessary for the defense to persuade him toward a life sentence, he acknowledged that he would look to the defense

to persuade him on mitigation. On redirect examination, Smith stated that if all he knew was that a defendant had been convicted of capital murder, then the prosecutor would have to prove to him that the defendant needed to be put to death. He agreed that he could follow the instructions and consider all the evidence before answering the mitigation special issue. He responded affirmatively when the prosecutor asked him whether he could set aside the defense's failure to present evidence, and whether the State had the burden of proof. On recross, Smith again stated that he would not expect the defense to try to persuade him or present evidence before he would consider a life sentence.

The trial court did not abuse its discretion by denying appellant's challenge for cause against Smith. As to the future-dangerousness special issue, he stated that he could set aside his personal feelings and follow the law on the State's burden of proof. As to the mitigation special issue, he was not challengeable for cause. Point of error six is overruled.

In appellant's third point of error, he complains of error in denying his proposed question to prospective juror Linda Bridges.[4] He argues that he was denied the opportunity to question her about the effect the victim's age would have on her ability to consider punishment. Bridges stated that she would have difficulty being fair in a case

---

[4] In argument, appellant also complained that the trial court erred by denying his challenge for cause against this prospective juror. Appellant did not include this complaint in his points of error. Therefore the Court does not address it. *See* Tex. R. App. P. 38.1(f), (h).

where the victim was elderly. Counsel proposed to ask her, "If it were shown at trial that the victim were 71, would that be enough to make you vote in such a way that the death penalty would be imposed, as opposed to a life sentence?" The trial court denied counsel's request to ask this question, explaining that the proposed question went too much into the specifics of the particular case.

Bridges was asked to explain a response she had given on the jury questionnaire, which was that she supported the death penalty in certain cases. She volunteered that if the case involved a child or an elderly person, defense counsel would not want her on the jury. On further questioning, most of her answers suggested that she would favor the death penalty in a case where an elderly victim could not take care of himself, and the person responsible for caring for him had murdered him. A few of her answers suggested that she would favor the death penalty in any case in which an elderly victim had been murdered.

Concerning the mitigation special issue, Bridges initially stated that she could not conceive of any scenario where she would answer the future-dangerousness issue affirmatively but then also find mitigating circumstances warranting a life sentence. After the law had been explained to her, however, she agreed that she could follow the law and consider mitigating circumstances even if she answered the first two special issues affirmatively.

The trial court has broad discretion over the process of selecting a jury. The trial

court's decision concerning the propriety of a particular question will not be disturbed absent an abuse of discretion. A trial court's discretion is abused only when a proper question about a proper area of inquiry is prohibited. A question is proper if it seeks to discover a juror's views on an issue applicable to the case. However, an otherwise proper question is impermissible if it attempts to commit the juror to a particular verdict based on particular facts. *Barajas v. State,* 93 S.W.3d 36, 38-39 (Tex. Crim. App. 2002) (citing *Standefer v. State,* 59 S.W.3d 177, 181 (Tex. Crim. App. 2001)); *see also Atkins v. State,* 951 S.W.2d 787, 789 (Tex. Crim. App. 1997). Furthermore, the trial court may prohibit "duplicitous questions" so long as investigation into proper matters is not entirely prevented. *Allridge v. State,* 762 S.W.2d 146, 167 (Tex. Crim. App. 1988).

Here, Bridges could, but she was not required to, consider the victim's age in determining punishment. She had already stated that she would favor the death penalty in a case where the victim was elderly. Therefore, it would have been improper as well as repetitious for appellant to ask Bridges whether she would favor the death penalty if it were shown that the victim was 71 years of age. Appellant was not entitled to commit Bridges to assess or refrain from assessing punishment on a specific age.

The trial court did not abuse its discretion by denying the proposed question. Point of error three is overruled.

## EXPERT WITNESS

In appellant's seventh point of error, he complains that the trial court erred in

admitting testimony from Gus Vaquera[5] as an expert on prison gangs because the State failed to meet its burden to prove that he was qualified to testify as an expert. TEX. R. EVID. 702. Appellant complains that Vaquera's training was limited to hours spent in the field and seminars presented by TDCJ, the Department of Public Safety, and Sam Houston College. Appellant asserts that at the Rule 702 hearing, Vaquera testified that classifying prisoners as gang members is not a scientific enterprise, but yet he also implied that there was a "scientific quality" to his testimony when he stated that only someone with his specialized training would be able to classify appellant as a TS prison-gang member based on his tattoos and his written correspondence. Appellant urges that the predictive nature of Vaquera's testimony concerning appellant's gang affiliation (and therefore his future dangerousness) brought it within the purview of scientific evidence. At trial, Vaquera testified to his opinion that appellant was an active, fairly highly placed member of the TS prison gang.

Texas Rule of Evidence 702 permits a witness qualified by knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would assist the trier of fact in understanding or determining a fact issue. The party presenting the witness as an expert has the burden of proving that the expert is qualified. *Wyatt v. State,* 23 S.W.3d 18, 27 (Tex. Crim. App. 2000). A witness's qualification to give an expert opinion may be derived from specialized

---

[5] Appellant's brief lists the name as "Gustavo Vaquero," but the record on appeal lists the name as "Gustava Vaquera" or "Gus Vaquera."

education, practical experience, a study of technical works, or a varying combination of these things. *Id.*

When addressing fields of study that are based primarily upon experience and training as opposed to the scientific method, the appropriate questions are: (1) whether the field of expertise is a legitimate one; (2) whether the subject matter of the expert's testimony is within the scope of that field; and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field. *Nenno v. State,* 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas,* 4 S.W.3d 720, 727 (Tex. Crim. App. 1999). "A trial court need not exclude expert testimony simply because the subject matter is within the comprehension of the average jury." *Rodgers v. State,* 205 S.W.3d 525, 527 (Tex. Crim. App. 2006).

"The question of whether a witness offered as an expert possesses the required qualifications rests largely in the trial court's discretion. Absent a clear abuse of that discretion, the trial court's decision to admit or exclude testimony will not be disturbed." *Nenno,* 970 S.W.2d at 561. The appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). In addition, the appellate court must review the trial court's ruling in light of what was before that court at the time the ruling was made. *Rodgers,* 205 S.W.3d at 528-29.

Appellate courts may consider several criteria in assessing whether a trial court has

clearly abused its discretion in ruling on an expert's qualifications, including the complexity of the field of expertise, the conclusiveness of the expert's opinion, and the centrality of the area of expertise to the case:

> First, is the field of expertise complex? The degree of education, training, or experience that a witness should have before he can qualify as an expert is directly related to the complexity of the field about which he proposes to testify. If the expert evidence is close to the jury's common understanding, the witness's qualifications are less important than when the evidence is well outside the jury's own experience. For example, DNA profiling is scientifically complex; latent-print comparison (whether of fingerprints, tires, or shoes) is not. Second, how conclusive is the expert's opinion? The more conclusive the expert's opinion, the more important is his degree of expertise. Testimony that "a given profile occurred one time in 2.578 sextillion (2.578 followed by 21 zeroes), a number larger than the number of known stars in the universe (estimated at one sextillion)" requires a much higher degree of scientific expertise than testimony "that the defendant's tennis shoe could have made the bloody shoe print found on a piece of paper in the victim's apartment." And third, how central is the area of expertise to the resolution of the lawsuit? The more dispositive it is of the disputed issues, the more important the expert's qualifications are. If DNA is the only thing tying the defendant to the crime, the reliability of the expertise and the witness's qualifications to give his opinion are more crucial than if eyewitnesses and a confession also connect the defendant to the crime.

*Rodgers,* 205 S.W.3d at 528 (internal citations omitted).

At the Rule 702 hearing, Vaquera testified that he was employed by TDCJ as an STG coordinator. He testified that he supervised 27 gang officers throughout the region.[6] He testified that his duties included reviewing packets of information submitted by the gang-intelligence officers who conducted investigations into prisoners' suspected gang-

---

[6] He testified that Texas is divided into six regions, each of which has an STG coordinator. He was the STG coordinator for Region 5.

related activities and making determinations whether the information submitted was "good to concur or not concur" with the gang-intelligence officers' conclusions concerning prisoners' gang membership. That information would then be submitted to Huntsville "for confirmation on gang members." Vaquera testified that he had worked as a gang-intelligence officer and in the office of the STG coordinator for over thirteen years. He had attended roughly 400 hours of training on gang intelligence that was provided by TDCJ in Huntsville as well as training on gangs that was provided by other state agencies. He explained that the courses he had taken dealt with recognizing the tattoos, slang, and codes used by STG's. He had been promoted to his position as STG coordinator in 2003. He testified that he had taught courses in the area of prison-gang identification and that he had testified previously as a prison-gang expert. He described the criteria and the process followed within TDCJ for making a determination whether a person is a member of a gang. He testified that he had personally reviewed photographs of tattoos on appellant's body and that he had also viewed appellant's body to verify that the photographs were accurate. He had reviewed the STG file prepared on appellant, including correspondence between appellant and known TS members. He described the distinguishing characteristics of appellant's tattoos that he had identified as signifying TS membership.

Vaquera acknowledged that his specialized knowledge was not the product of academic training or the subject of any academic discipline. Vaquera agreed that if he

testified, he would be describing his observations to the jurors and then the jurors would be free to draw their own conclusions. At the end of the hearing, defense counsel objected to Vaquera being designated as an expert witness, arguing that Vaquera's conclusions were based on observations of matters that could be presented to the jury for their own conclusions, and that Vaquera demonstrated no special academic knowledge or training that would qualify him more than a juror to draw a conclusion concerning appellant's gang membership:

> I'm going to object to the officer offering an expert opinion because he does not meet the requirements of Rule 702. The basis for his conclusions are nothing more than a recitation of his observations of matters that can be presented to the jury for their own conclusion. And he demonstrates no special academic knowledge and no special training or experience outside of on-the-job training that would qualify him more so than a juror to draw a conclusion concerning gang membership. And we object for that reason.

The court overruled the objection without explanation.

The trial court did not abuse its discretion in allowing Vaquera to testify as an expert regarding prison gangs. *Cf. Wyatt,* 23 S.W.3d at 28. Vaquera's testimony described his years of professional experience and hundreds of hours of training in the field of prison gang intelligence and identification. Vaquera testified that his opinion was based on his observations and investigation, and that he would describe his observations to the jurors who would then draw their own conclusions. In light of what was before the court at the time the ruling was made, the trial court did not abuse its discretion by determining that Vaquera's specialized knowledge would aid the trier of fact and that he

was qualified to testify. Point of error seven is overruled.

In his eighth point of error, appellant complains that the trial court erroneously permitted Vaquera to testify as an expert, in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article 1, section 19, of the Texas Constitution. He argues that the United States Constitution imposes a heightened need for reliability and individualized sentencing determinations in assessing the death penalty. He urges that Vaquera's testimony should not have been admitted because it was generalized and unreliable. He states, "[t]he very essence of [Vaquera's] testimony was based on the propensity of individuals bearing certain tattoos and markings to join prison gangs, and on the propensity of members of prison gangs to commit acts of violence within the prison system."

Appellant has failed to preserve error because he never objected at trial that the admission of Vaquera's testimony violated the federal or state constitutions. *See* TEX RULE APP. P. 33.1; *Briggs v. State,* 789 S.W.2d 918, 924 (Tex. Crim. App. 1990). Point of error eight is overruled.

RIGHT OF ALLOCUTION

In his twelfth point of error, appellant claims that the trial court violated the Eighth and Fourteenth Amendments to the United States Constitution by denying his request to issue a statement of allocution not subject to cross-examination. Appellant asserts that he should have been allowed to express his remorse before the punishment was assessed,

while it could have had some effect. By a pre-trial motion, appellant made a request to personally express his remorse to the victim's family in the presence of the jury without being subject to cross-examination. Appellant asserts that the trial court's denial of this request violated his constitutional right to present mitigating evidence.[7]

Although he uses the term "allocution," appellant's argument is in substance that he should have been able to introduce mitigating evidence free from cross-examination. Neither the United States Supreme Court nor this Court has held that a defendant has a constitutional right to present mitigating evidence free from cross-examination before punishment has been assessed. *See, e.g., Jenkins v. Anderson,* 447 U.S. 231, 238 (1980); *Renteria v. State,* 206 S.W.3d 689, 698 (Tex. Crim. App. 2006). Furthermore, the United States Supreme Court has not found that the federal constitution mandates a right of allocution free from cross-examination before punishment has been assessed. *See, e.g., Hill v. United States,* 368 U.S. 424, 429 (1962) (finding no constitutional violation when trial court violated federal procedural rule mandating that court ask defendant if he had

---

[7] In his argument on appeal, appellant also appears to suggest that his pre-trial motion should have been granted in accordance with Article 42.07: "Appellant's motion to make a statement of allocution free from cross-examination rose to the level of a Constitutional right since Article 42.07 provides a vehicle with which the relevant mitigating evidence could be properly admitted." Article 42.07 states that, before the sentence is pronounced, the defendant shall be asked whether he has anything to say as to why the sentence should not be pronounced against him. Article 42.07 sets forth three specific legal reasons why a sentence cannot be pronounced against the defendant: (1) that he has received a pardon; (2) that he is incompetent; and (3) that he is not the person convicted. Appellant has not shown that his pre-trial motion to express remorse free from cross-examination implicated Article 42.07. The record reflects that the court asked appellant whether he had anything to say before sentence was pronounced. Appellant stated that he did not.

anything to say before sentence was imposed). The Supreme Court declined to consider this question after the Court of Appeals for the Fifth Circuit held that a defendant in a capital case did not have a constitutional right to make a statement of remorse free from cross-examination before punishment had been assessed. *See United States v. Hall,* 152 F.3d 381, 397 (5th Cir. 1998), *cert. denied,* 526 U.S. 1117 (1999) (abrogated on other grounds by *United States v. Martinez-Salazar,* 528 U.S. 304 (2000)). Likewise, this Court has not interpreted the constitution as requiring such a right. "Remorse following commission of a serious crime may well be a circumstance tending in some measure to mitigate the degree of a criminal's fault, but it must be presented in a form acceptable to the law of evidence." *Lewis v. State,* 815 S.W.2d 560, 568 (Tex. Crim. App. 1991). Point of error twelve is overruled.

## 10-12 RULE

In appellant's point of error eleven, he argues that failing to instruct the jury that a vote by one of them would result in a life sentence despite the statutory requirement of ten votes for a "no" answer on the future-dangerousness issue or a "yes" answer on the mitigation issue constituted a violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Appellant acknowledges that we have rejected his arguments in previous cases. *See, e.g., Druery v. State,* 225 S.W.3d 491, 509 (Tex. Crim. App.), *cert. denied,* 128 S. Ct. 627 (2007); *Prystash v. State,* 3 S.W.3d 522, 536 (Tex. Crim. App. 1999). Appellant has not distinguished his case from those cases. Point of

error eleven is overruled.

## REASONABLE DOUBT INSTRUCTION

In his thirteenth point of error, appellant claims that the trial court violated the Eighth and Fourteenth Amendments of the United States Constitution by denying his request to instruct the jury that each individual juror should determine his or her own personal definition of reasonable doubt. He argues that this omission created a substantial risk that the death sentence would be administered arbitrarily or capriciously.

Appellant acknowledges that the United States Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. *See Paulson v. State,* 28 S.W.3d 570, 573 (Tex. Crim. App. 2000) (citing *Victor v. Nebraska,* 511 U.S. 1 (1994)). He urges, however, that the instruction he proposed would not have been a definition of reasonable doubt but instead would have safeguarded the fairness of the proceeding by giving guidance to the jurors in answering the special issues and applying "reasonable doubt" as a term of art. He asserts that failing to give the instruction created a substantial risk that the death sentence would be administered arbitrarily or capriciously. This argument is without merit.

The Supreme Court has stated that a capital-sentencing scheme should channel the sentencer's discretion by objective standards that make the sentencing process rationally reviewable:

> [A] capital sentencing scheme must suitably direct and limit the sentencer's discretion so as to minimize the risk of wholly arbitrary and capricious

action. The State must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death.

*Arave v. Creech,* 507 U.S. 463, 471 (1993) (quoting *Lewis v. Jeffers,* 497 U.S. 764 (1990)) (internal quotation marks omitted).

"A trial judge's duty is to give instructions sufficient to explain the law." *Kelly v. South Carolina,* 534 U.S. 246, 257 (2002). "Words which are not statutorily defined are to be given their usual meanings and no specific instructions are required." *Martinez v. State,* 924 S.W.2d 693, 698 (Tex. Crim. App. 1996). The instruction requested here is not required by Texas law or federal law.

Here, the court's charge included the following jury instructions:

The State must prove Special Issue No. 1 submitted to you beyond a reasonable doubt, and you shall return a Special Verdict of "Yes" or "No" on Special Issue No. 1.

In deliberating on Special Issue No. 1 you shall consider all the evidence in this trial, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

You may not answer Special Issue No. 1 "Yes" unless you agree unanimously.

You may not answer Special Issue No. 1 "No" unless ten (10) or more jurors agree.

Members of the jury need not agree on what particular evidence supports a negative answer to Special Issue No. 1.

You are further instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or

public feeling in considering all of the evidence before you and in answering Special Issue No. 1.

The State must prove Special Issue No. 2 submitted to you beyond a reasonable doubt, and you shall return a Special Verdict of "Yes" or "No" on Special Issue No. 2.

It is not required that the State prove Special Issue No. 1 and Special Issue No. 2 beyond all possible doubt, it is only required that the State's proof excludes all "reasonable doubt" concerning the defendant.

The final page of the court's charge included the following language:

In arriving at the answers to the Special Issues submitted, it will not be proper for you to fix the same by lot, chance, or any other method than by a full, fair and free exchange of the opinion of each individual juror.

After reading of this charge, you shall not be permitted to separate from each other, nor shall you talk with anyone not of your jury. After argument of this charge, you shall be permitted to consider your answers to the Special Issues submitted to you. It is the duty of the Foreman of the Jury to preside in the jury room and vote with you on the answers to the Special Issues submitted.

You are the exclusive judges of the facts proved, the credibility of the witnesses, and the weight to be given to their testimony, but you are bound to receive the law from the Court which has been given you and you are bound thereby.

Accordingly, the court's charge included admonishments to the jurors that they were not to be swayed by mere sentiment or, *inter alia,* public opinion, and that it would not be proper for them to fix their answers by any other method than by a full, fair and free exchange of the opinion of each individual juror. Appellant has not shown that the requested instruction – that each juror individually was to determine what a reasonable doubt meant to him or her – would have diminished the risk that the sentence would be

imposed arbitrarily and capriciously and without clear and objective standards that would make the process rationally reviewable. Point of error thirteen is overruled.

GOOD CONDUCT TIME AND PAROLE ELIGIBILITY JURY INSTRUCTIONS

In appellant's tenth point of error, he argues that the trial court erred in overruling his objection to the jury instruction that informed the jury of the possibility that a life sentence could be reduced by the award of good-conduct time and/or through parole. He asserts that the court's instruction tracked Article 37.07, section 4(b), which is applicable only to non-capital cases, except that the fourth paragraph concerning parole eligibility was modified to apply to a capital life sentence.[8] He notes that after he objected, the State

---

[8] Here, as in *Ross v. State,* 133 S.W.3d 618, 623 (Tex. Crim. App. 2004), the jury received the good-conduct time/parole-eligibility instructions set forth in Article 37.07, section 4(b), applicable to non-capital offenses, except that the trial court replaced the parole eligibility instruction set forth in the fourth paragraph of Article 37.07, section 4(b), with the parole-eligibility instruction set forth in Article 37.071, section 2(e)(2)(B), effective for capital offenses committed on or after September 1, 1999.

As such, the jury instruction given was:

Under the law applicable in this case, the defendant, if sentenced to a term of life imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts rehabilitation. If a prisoner engages in misconduct, prison authorities may take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned on a life sentence might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment in the Correctional Institutions Division of the Texas Department of Criminal Justice for life, he will not become eligible for parole

(continued...)

joined him in his objection and agreed that the good-conduct-time language should be taken out of the jury instruction, but the trial court overruled the objection.

Appellant challenges the entire instruction on appeal, but he did not object to the parole-eligibility instruction at any time before or during the proceeding. Appellant asserts that the entire instruction was erroneous and caused egregious harm, in that "the misstatement of law harmed appellant because it created a scenario where an individual juror who may have been considering a life sentence could have been influenced to instead vote for death because of the prospect that a life sentence could be reduced through parole and/or good conduct time."

Assuming *arguendo* that the parole-eligibility instruction was erroneous, it did not cause egregious harm. The parole-eligibility instruction informed the jury correctly that appellant would not become eligible for parole until he had served forty calendar years, without consideration of good-conduct time, and that eligibility for parole did not

---

[8](...continued)
until the actual calendar time served, without consideration of good conduct time, equals forty (40) calendar years. Eligibility for parole does not guarantee that parole will be granted.

It cannot be accurately predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment for life, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

guarantee that parole would be granted.  Furthermore, the record does not show that this accurate parole-eligibility instruction deprived appellant of a fair and impartial trial.

Many cases strongly suggest that parole-eligibility instructions such as the one set forth in the post-September 1, 1999 version of Article 37.071, section 2(e)(2)(B), generally inure to the benefit of the defendant.  *See, e.g., Brown v. Texas,* 522 U.S. 940 (1997) (Stevens, J., joined by Souter, Ginsberg, and Breyer, JJ., concurring in denial of certiorari) (recognizing "obvious tension" between Court's decisions holding unconstitutional South Carolina's practice of preventing jurors in a capital case from learning that a life-sentenced defendant was parole ineligible, and Court's decision not to consider constitutionality of Texas's practice of giving trial court discretion whether to instruct jury in a capital case concerning life-sentenced defendant's minimum parole eligibility date); *O'Dell v. Netherland,* 521 U.S. 151, 166 n.3 (1997) (observing that South Carolina's practice, found unconstitutional in *Simmons,* was "similar" to other states' practices that the Court had declined to find unconstitutional, and citing, *inter alia,* its denial of certiorari on three Texas cases concerning practice of giving trial court discretion whether to allow jury voir dire and jury instructions concerning minimum parole eligibility date); *Simmons v. South Carolina,* 512 U.S. 154 (1994) (recognizing that making jurors aware of defendant's parole ineligibility may rebut the State's future dangerousness argument); *Cockrell v. State,* 933 S.W.2d 73, 91 (Tex. Crim. App. 1996) ("[W]e note the usual scenario in which this issue has arisen is where capital defendants

have complained on appeal about a trial court's failure to submit the type of charge appellant 'acquiesced' to in this case"); *Smith v. State,* 898 S.W.2d 838, 857-72 (Tex. Crim. App. 1995) (Clinton, J., dissenting) (surveying cases and discussing mitigating value of minimum parole eligibility date). We see no reason to hold differently in this case.

We next turn to the erroneous good-conduct-time instruction. Appellant objected to that part of the jury instruction at the charge conference. However, this Court has found a virtually identical error to be harmless, so long as there was no reasonable probability that the jury was misled into believing that if the defendant received a life sentence he might become eligible for parole in less than forty years through the award of good-conduct time, or that he was certain to be released after he became eligible for parole. *See Ross v. State,* 133 S.W.3d 618, 623 (Tex. Crim. App. 2004).[9]

---

[9] The jury instruction given in *Ross* was:

Under the law applicable in this case, the defendant, if sentenced to a term of life imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned on a life sentence might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, he will not become eligible for parole until the actual calendar

(continued...)

Appellant argues that this Court should reconsider the harm analysis in *Ross* because it directly conflicts with the Supreme Court's harm analysis concerning parole-eligibility instructions in capital cases. He cites *Kelly v. South Carolina* for the proposition that, in a capital case, the absence of evidence of juror confusion in the record does not mean that an erroneous parole-eligibility instruction was harmless. 534 U.S. 246 (2002).

In *Kelly,* the Supreme Court discussed the harm of failing to give a constitutionally required parole-ineligibility instruction when the sentencing options were life without parole and death. 534 U.S. at 257. In another case, the Supreme Court expressly limited this constitutional requirement to cases where, as a legal matter, there was no possibility of parole if the jury assessed a sentence of life in prison. *Ramdass v. Angelone,* 530 U.S. 156, 170 (2000). There, the Court reaffirmed the general rule that "the States have some discretion in determining the extent to which a sentencing jury should be advised of

---

[9](...continued)
time served without consideration of good conduct time, equals forty calendar years. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment for life, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded or forfeited by this particular defendant.

133 S.W.3d at 622-23 (footnotes and original emphasis omitted).

probable future custody and parole status in a future dangerousness case." *Id*. at 165.

The Supreme Court in *Kelly* did not purport to address a situation such as this one, in which a correct parole-eligibility instruction was given simultaneously with an erroneous good-conduct-time instruction. As in *Ross,* the instruction given here accurately informed the jury that a life-sentenced defendant would not be eligible for parole for forty years; the charge informed the jury that a life-sentenced defendant "may" be released from prison after forty years, not that he necessarily would be; the jury was instructed not to consider how good-conduct time might be applied to the defendant; and there was no evidence in the record to rebut the presumption that the jury followed this instruction. *See Ross,* 133 S.W.3d at 624.

Having reviewed the challenged instruction in the context of the jury instructions as a whole and the trial record, we hold that the inclusion of the parole-eligibility instruction, even if erroneous, caused no egregious harm. The inclusion of the good-conduct-time instruction, although erroneous, was harmless. Point of error ten is overruled.

EXECUTION PROTOCOL

In his fourteenth point of error, appellant contends that Texas's execution protocol violates the Eighth Amendment of the United States Constitution which prohibits cruel and unusual punishment. He argues that the execution protocol is inconsistently administered and that it uses chemicals which have been banned for euthanizing animals.

Appellant's execution is not imminent; therefore, the method in which it is currently carried out is not determinative of the way it will be administered at appellant's execution. This claim is not ripe for our review. *See Gallo v. State,* 239 S.W.3d 757, 780 (Tex. Crim. App. 2007). Point of error fourteen is overruled.

We affirm the judgment of the trial court.

Meyers, J.

Delivered: November 26, 2008
Do Not Publish