**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRANK JOSEPH MATYLINSKY,
　　　　　*Petitioner-Appellant,*

　　　　　　v.

MICHAEL BUDGE,
　　　　　*Respondent-Appellee.*

No. 08-15459

D.C. No.
3:03-CV-00497-
LRH-RAM

OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
May 5, 2009—San Francisco, California

Filed August 18, 2009

Before: Michael Daly Hawkins and Richard C. Tallman,
Circuit Judges, and James K. Singleton,*
Senior District Judge.

Opinion by Judge Tallman

---

*The Honorable James K.Singleton, United States District Judge for the District of Alaska, sitting by designation.

11287

**COUNSEL**

Franny A. Forsman and John C. Lambrose, Office of the Federal Public Defender, Las Vegas, Nevada, for the appellant.

Catherine Cortez Masto and Amy E. Crowe, Office of the Nevada Attorney General, Reno, Nevada, for appellees.

**OPINION**

TALLMAN, Circuit Judge:

We must decide whether trial counsel was ineffective in a 1984 Nevada murder case.[1] Frank Matylinsky ("Matylinsky") alleges that his attorney provided ineffective assistance under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). We disagree, and we affirm the district court's denial of habeas relief.

**I**

After spending an evening drinking and ingesting illicit substances, Matylinsky returned home to his pregnant wife, Margaret ("Peggy") Matylinsky. Domestic violence ensued. Though Matylinsky claims he does not recall killing his wife, her autopsy showed that she received as many as forty blows to her head alone. Over eighty percent of her brain surface

---

[1]In a concurrently filed memorandum disposition, we reject Matylinsky's additional challenges to the district court's decision. *See Matylinsky v. Budge*, No. 08-15459, 2009 WL ___ (9th Cir. ___ ___, 2009).

had swelled due to the severity of the beating, and her face was covered with bruises. Her hair had been torn from her scalp and was found in the bedroom, washing machine, toilet, bed, and on the dresser. Ninety-five percent of her back was bruised, and similar bruising appeared on her shoulders and legs, all the result of prolonged kicking by Matylinsky. Though wearing shoes, Matylinsky sustained broken toenails from repeatedly striking Peggy. He had Peggy's blood on his hands, clothes, feet, and shoes. It was also splattered throughout the house, indicating that the fight had continued for a prolonged period of time and throughout the home.

There was evidence that Matylinsky had tried to clean the house, even while heavily intoxicated. Peggy was found unclothed; her bloodied nightgown in the home's washing machine. He claims that he blacked out before the attack and recalls nothing until he woke up next to Peggy's unconscious, battered body. Her breathing was labored. He attempted to revive her using both CPR and an oxygen tank located in the home, and when neither method succeeded, he stumbled to his neighbors to seek help. He subsequently called 911, and paramedics and police arrived at the scene.

The transcript of the crime scene tape recorded by responding Sparks Police Officers reveals a very drunk and profane Matylinsky, who was unable to recall the details of what had happened. In his drunken state, he worried about his wife, his unborn child, the upcoming Christmas holiday, and his household dogs. He failed to string together coherent sentences, focused on unimportant details, seemed to be wandering about the home and outside, and was unsure of any particulars about the altercation. He was taken into police custody where he was questioned and ultimately charged with the double homicides of his wife and unborn child.

Throughout his two-week trial and sentencing, Matylinsky was represented by Fred Atcheson ("Atcheson"). On September 19, 1984, a jury convicted Matylinsky of the first-degree

murder of his wife and manslaughter of his unborn child. The state sought the death penalty, but the Reno jury sentenced him to life without the possibility of parole for murder plus ten years for manslaughter.

Matylinsky directly appealed the judgment to the Nevada Supreme Court. Before a decision was rendered in his direct criminal appeal, Matylinsky filed a post-conviction petition for a writ of habeas corpus in the Second Judicial District of Nevada. On April 30, 1986, the Supreme Court of Nevada entered an order holding Matylinsky's direct appeal in abeyance pending the resolution of his post-conviction petition. The state district court held evidentiary hearings regarding Matylinsky's post-conviction litigation on April 17 and 24, 1987. It denied relief in an opinion, and issued separate findings of fact and conclusions of law, in August and September 1987.

The Nevada Supreme Court consolidated the post-conviction petition and the direct appeal, and summarily dismissed both on November 22, 1988. Matylinsky then filed, pro se, a second post-conviction petition for habeas corpus on June 1, 1989, in the First Judicial District of Nevada. The state district court denied the petition as successive. He again appealed to the Nevada Supreme Court, and it affirmed the district court's determination.

Matylinsky filed his first federal habeas petition pro se in 1991, which, following four amended petitions, was dismissed by the federal court without prejudice in 1993. He was sent back to the state courts to exhaust the remaining claims. He subsequently filed a third state post-conviction petition in the Second Judicial District of Nevada. That court held a hearing regarding procedural default and dismissed the petition. It found that, under Nevada law, he had failed to raise all his claims in the proper petition. The Nevada Supreme Court affirmed that dismissal on procedural default grounds.

Matylinsky again returned to federal court, and his amended petition was filed by the Nevada Federal Public Defender on July 6, 2004. He raised twenty-one separate claims, many with sub-parts. The federal district court dismissed some of those claims as procedurally barred either because of default in the state courts or failure to properly exhaust. It denied the remainder of the claims on the merits. It granted a Certificate of Appealability for the portion of Matylinsky's ineffective assistance claim that was not procedurally barred from review.[2]

## II

The district court's denial of Matylinsky's habeas corpus petition under 28 U.S.C. § 2254 is reviewed *de novo*. *Hebner v. McGrath*, 543 F.3d 1133, 1136 (9th Cir. 2008). We review factual findings made "in the context of granting or denying the petition for clear error." *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004).

[1] Even though he was convicted in 1984, Matylinsky's petition is subject to review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as his federal petition was filed in 2003. *Woodford v. Garceau*, 538 U.S. 202, 210 (2003) (holding that AEDPA applies to applications filed in the federal courts after April 24, 1996 (citing *Lindh v. Murphy*, 521 U.S. 320 (1997))). AEDPA first commands that the petitioner exhaust all remedies available in the state courts, unless the state lacks proper "corrective process." 28 U.S.C. § 2254(b)(1). We then review the state court's determinations through a "highly deferential" lens. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). We may not grant a habeas petition unless the "last reasoned" state court decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

---

[2]The claims addressed in this opinion, as presented to the district court, are as follows: 18(A, E, H, M-N, Q-S, U-X, Z, AA).

by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

**[2]** However, when a petitioner has exhausted his petition, but there is no reasoned analysis to which we can apply the AEDPA standard, we must make an "independent review of the record" to determine whether the claim is meritorious. *Richter v. Hickman*, No. 06-15614, 2009 WL 2425390, at *5 (9th Cir. Aug. 10, 2009) (en banc).

## III

**[3]** Matylinsky challenges the competency of his trial attorney, Atcheson, ultimately arguing that he is entitled to a new trial. In order to succeed on an ineffective assistance of counsel claim, the petitioner must satisfy the two-pronged test promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the petitioner must demonstrate that counsel's performance was deficient and 'fell below an objective standard of reasonableness.' " *Hebner*, 543 F.3d at 1137 (quoting *Strickland*, 466 U.S. at 688). "Second, the petitioner must establish prejudice by demonstrating that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694).

Judicial inquiry into "counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 689, and while the standard is "by no means insurmountable," it remains "highly demanding." *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "Only those habeas petitioners who can prove under *Strickland* that

they have been denied a fair trial by the gross incompetence
of their attorneys will be granted the writ and will be entitled
to retrial." *Kimmelman*, 477 U.S. at 382.

We reject Matylinsky's claim that he suffered ineffective
assistance of counsel during his trial phase based on: (1)
counsel's overall trial strategy and decision not to give a prov-
ocation excuse to mitigate murder to manslaughter; (2) coun-
sel's failure to fully investigate and cross-examine
government witnesses; (3) counsel's failure to present evi-
dence regarding the voluntariness of his *Miranda* waiver; (4)
counsel's failure to strike an alternate juror during voir dire;
(5) counsel's failure to compel additional character witnesses;
(6) counsel's alleged refusal to permit Matylinsky to testify
on his own behalf at trial; (7) counsel's failure to investigate
the results of a drug screen test; and (8) counsel's failure to
object to the state's torture aggravator. Although it is possible
that counsel's performance was deficient in some of the above
areas, Matylinsky fails to show prejudice.

## A

Though Matylinsky never explicitly argues that Atcheson's
trial strategy was deficient, many of his claims center around
the defense theory Atcheson chose. It is clear from the record
that Atcheson decided to pursue an intoxication defense to the
first-degree murder charge. Matylinsky contends that Atche-
son should have argued manslaughter as opposed to murder
because Peggy provoked him, causing him to repeatedly beat
her in self defense.

The state court found that Atcheson's trial strategy was not
only eminently reasonable, but that it likely saved Matylin-
sky's life. The court said that "Atcheson was wise in his strat-
egy. . . . The strategy was the *only* approach consistent with
the physical evidence. Counsel's strategy was successful.
Petitioner did not receive the death penalty. . . . In essence,

counsel's decisions were strategic and tactical in an effort to save his client from the ultimate penalty."

**[4]** Matylinsky bears the burden of proving that Atcheson's trial strategy was deficient. "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689. "[He] bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001). "In determining whether the defendant received effective assistance of counsel, 'we will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight,' but rather, will defer to counsel's sound trial strategy." *Id.* (quoting *Strickland*, 466 U.S. at 689). "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." *Strickland*, 466 U.S. at 681.

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. The court must then consider those acts or omissions against "prevailing professional norms." *Id*. Even then, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*.

**[5]** Matylinsky has not met this "heavy burden." He has shown no evidence indicating that Atcheson was unreasonable or ineffective for selecting his chosen trial strategy. He presented no alternate attorney's determination challenging Atcheson's decision to pursue an intoxication defense. He has not quoted any "[p]revailing norms of practice as reflected in American Bar Association standards and the like" indicating that Atcheson acted outside these norms. *Id.* at 688. He did

not even present testimony from Atcheson which could poten-
tially show flaws in the trial strategy.[3] We have no trouble
finding that the state court's application of federal law was
proper, and that Atcheson employed a reasonable trial strat-
egy.

Many of Matylinsky's claims of ineffective assistance are
actually derivative of his quarrel with counsel's trial strategy.
The state court found that

> [a]ny of the evidence which [ ] Matylinsky has pro-
> posed which would explain or excuse his other prior
> acts would have harmed [his] case. . . .  Any inquiry
> in [an effort to explain Matylinsky's prior acts]
> would have focused the jury's attention on [ ]
> Matylinsky's ability to form intent to hurt his wife.
> As such, [ ] Atcheson's choice not to attempt to
> explain away other acts was a strategic one and has
> not been shown to be improper.

**[6]** We agree. Matylinsky's argument that Atcheson should
have called witnesses to show Peggy's ability to provoke
Matylinsky is without merit. Also meritless is his claim that
the jury should have been instructed on manslaughter and
provocation. *See Butcher v. Marquez*, 758 F.2d 373, 376 (9th
Cir. 1985) ("Under the *Strickland* test, counsel's strategic
choice to forgo an instruction for voluntary manslaughter was
reasonable because counsel had good cause to believe that
further efforts to obtain such an instruction would harm [the
defendant's] case."). The same is true for Atcheson's intro-
duction of the crime scene audio tape, which he admitted to

---

[3]Though Atcheson did not testify during the evidentiary hearing, he did
explain to the trial jury in closing arguments why he chose intoxication as
a defense to first-degree murder as opposed to provocation with a man-
slaughter instruction. He said: "it's contrary . . . to human nature to believe
there is any adequate provocation for what we see [in the pictures of the
victim]."

show Matylinsky's drunken, belligerent, and incoherent nature just hours after the attack. Atcheson's decision to not call the expert witnesses Drs. Griswold and Chappel to prove up the provocation excuse was also a reasonable strategic decision.

**B**

**[7]** Matylinsky next argues that Atcheson failed to fully investigate four prosecution witnesses: Dean Kennedy, Janet Wolder, Al Wolder, and Lynn Anderson. The United States Supreme Court has said that counsel need not undertake exhaustive witness investigation. The question is not "what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). While "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," an attorney's strategic decisions "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690-91; *see also Richter*, 2009 WL 2425390, at *9 (holding that it was not reasonable for counsel to rely on a credibility theory without first investigating any evidence in support of that strategy).

The Court has explained that it is unacceptable for an attorney to ignore damaging information the state is planning to introduce. However, it has never explained what amount of investigation is sufficient. *See Rompilla v. Beard*, 545 U.S. 374, 384 -88 (2005). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

**1**

Dean Robert Kennedy ("Kennedy") was a prosecution witness at trial who was housed with Matylinsky in the detention center. He testified that Matylinsky had informed him that Peggy "had it coming." Matylinsky insists that had Atcheson conducted a proper inquiry, he would have uncovered that (1) Kennedy was a paid police informant seeking to avoid additional jail time; and (2) Kennedy had been convicted of between four and five felonies, as opposed to the two discussed in cross-examination.

The state district court held that "Atcheson had completed sufficient investigation or had sufficient knowledge to put the credibility of Kennedy thoroughly at issue." It noted that Kennedy had been asked whether he received anything in return for his testimony and that Atcheson extracted the fact that Kennedy had been convicted on at least two occasions. Finally, the trial judge said that while "more extensive investigation could have discovered more felonies, . . . I don't believe it would have changed anything concerning Kennedy's credibility. The issue was before the jury."

**[8]** The state court's analysis was not objectively unreasonable. Atcheson impeached Kennedy regarding his prior convictions and minute facts surrounding the statements Kennedy heard from Matylinsky. While it appears that Atcheson could have introduced additional impeaching evidence, this extra information would not have changed the outcome of the trial because Kennedy's credibility was already squarely before the jury. Therefore, even if Atcheson erred by not completing additional investigation, no prejudice resulted from his inadequate preparation.

**2**

At trial, Janet Wolder ("Janet") testified regarding Peggy's (her daughter) and Matylinsky's stormy relationship. She

explained that she had intercepted a telephone conversation between Matylinsky and Peggy a few months before Peggy's death. During the course of the telephone conversation, Matylinsky "threatened to commit suicide if [Peggy] didn't come back," "he threatened her life, he said that she'd never be with anybody else, he would kill her first," and then added that "he would kill anyone else who came near her." Matylinsky argues that had Atcheson conducted a more thorough investigation, he would have discovered the content of Janet's testimony.[4] However, he actually claims that Atcheson should have discovered that Janet was planning to give objectionable hearsay testimony.

[9] Atcheson's failure to object to this testimony as hearsay was not in error. The statements relayed by Janet reflected Matylinsky's words, not those of another individual. Statements made by the defendant offered against the defendant to support the prosecution's case are excluded from the definition of hearsay. Fed. R. Evid. 801(d)(2)(A). Had Atcheson made a hearsay objection, it would have been properly overruled. *See Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (noting that if a petitioner challenges a futile objection, he fails both *Strickland* prongs).

**3**

Matylinsky next claims that Atcheson both failed to investigate, and failed to object to, testimony given by Al Wolder — Peggy's step-father—and Lynn Anderson—Peggy's childhood friend. Matylinsky argues that Atcheson should have investigated the witnesses and instead was taken by surprise

---

[4]Matylinsky also argues that Janet's interception of his private phone call violated Nevada Revised Statutes section 179.505(1). Even if the evidence was obtained in violation of Nevada's state law, Matylinsky does not claim that there was a violation of any constitutional right. Therefore, this portion of his claim fails. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law." (internal quotation marks and citation omitted)).

when they were called to the stand. Both were called to rebut testimony from the defendant's case-in-chief regarding Matylinsky's good character and positive relationship with his wife. As we have previously held in federal prosecutions, the government ordinarily need not disclose the names of rebuttal witnesses. *See United States v. Gering*, 716 F.2d 615, 621 (9th Cir. 1983); *United States v. Angelini*, 607 F.2d 1305, 1308-09 (9th Cir. 1979). Neither the Nevada legislature nor its courts have ever explicitly determined whether the government must disclose rebuttal lay witnesses. *See* Nev. Rev. Stat. § 174.234(1)(a)(1)-(2) (requiring the State and the defendant to disclose the identity of potential witnesses before trial), *invalidated on other grounds by Grey v. State*, 178 P.3d 154, 159-161 (Nev. 2008) (requiring disclosure of expert rebuttal witnesses).

**[10]** Matylinsky fails to satisfy the *Strickland* requirements because he cannot prove Atcheson's behavior was deficient. He provides no evidence tending to show Atcheson's failure to investigate these lay rebuttal witnesses and we believe it was reasonable for Atcheson to not investigate. He also argues that "[h]ad counsel properly prepared, he could have prevented the jury from hearing this testimony." This claim is without merit. Because the witnesses were properly introduced as rebuttal witnesses to testify to Matylinsky's character *after* his good character had been put in evidence by the defense, there was no objection Atcheson could properly have made to preclude this testimony. Fed. R. Evid. 404(a)(1); Nev. Rev. Stat. § 48.045(1)(a).

## C

Matylinsky next claims that Atcheson failed to present evidence at the *Jackson v. Denno*[5] hearing showing that Matylin-

---

[5]A *Jackson v. Denno,* 378 U.S. 368, 392 (1964), hearing is an evidentiary hearing, outside the presence of the jury, where the court inquires as to the voluntariness of the defendant's confession. Through this hearing, the court is able to determine the factual context surrounding a defendant's confession. *Id.* In the instant case, the trial court held a hearing regarding whether Matylinsky's taped interrogation statements and *Miranda* waiver were voluntarily obtained.

sky's waiver of his *Miranda*[6] rights was involuntary. He contends that while Atcheson initially objected to admission of the interrogation tape, he then presented no independent evidence, relied solely on government witness testimony, and failed to object to the admission of the *Miranda* waiver form.

The court first heard testimony from Detective Darrell Jones, the officer who *Mirandized* Matylinsky. He explained to the judge that Matylinsky had been read his rights and signed a *Miranda* waiver form sometime around 10:15 a.m. on December 21, 1983. This interview between Detective Jones, Matylinsky, and other officers was also recorded on cassette tape. Throughout the interrogation, Matylinsky seemed to understand the questions he was being asked by the officers, as "[h]is responses to the questions were in line with what the questions were." The officers did not threaten him, fed him lunch when he was hungry, and ceased questioning when he invoked his right to an attorney. Following his theory of the case, Atcheson elicited responses on cross-examination regarding Matylinsky's perceived level of intoxication at varying points during the interrogation—e.g., when the officers first arrived at Matylinsky's home, when Matylinsky returned from examination at the hospital later that morning, when Matylinsky actually signed the *Miranda* waiver, and when Matylinsky finally requested an attorney.

The court heard argument from both attorneys at the conclusion of Detective Jones's testimony. Matylinsky claims that Atcheson's performance here was deficient because Atcheson neglected to present evidence in addition to Detective Jones's testimony. He insists that Atcheson should have admitted additional evidence and case law tending to show that an intoxicated individual cannot voluntarily waive his *Miranda* rights. He also argues that Atcheson should have notified the court that Matylinsky could also have been under the influence of drugs during his interrogation.

---

[6]*Miranda v. Arizona*, 384 U.S. 436 (1966).

**[11]** The state court found that Atcheson made a tactical decision to not present evidence outside Detective Jones's testimony. It opined that no other witness would have testified as to Matylinsky's state of mind at the time the statements were made, and therefore no witness now put forth by Matylinsky would have been able to testify as to the voluntariness of those statements. Finally, because evidence of Matylinsky's intoxication was not omitted—and was in fact presented by Atcheson—the question of voluntariness was "fully and fairly presented" during the hearing and Matylinsky's claims on review would not have affected the result.

While it is true that a waiver of one's *Miranda* rights must be done intelligently, knowingly, and voluntarily, 384 U.S. at 444, the Supreme Court has never said that impairments from drugs, alcohol, or other similar substances can negatively impact that waiver. *See Carey v. Musladin*, 549 U.S. 70, 74 (2006) (" '[C]learly established Federal law' in § 2254(d)(1) refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." (internal quotation marks and citation omitted)). We have held that an intoxicated individual can give a knowing and voluntary waiver, so long as that waiver is given by his own free will. *United States v. Banks*, 282 F.3d 699, 706 (2002), *rev'd on other grounds*, 540 U.S. 31 (2003); *see also United States v. Kelley*, 953 F.2d 562, 565 (9th Cir. 1992). However, at the time of Matylinsky's *Jackson v. Denno* hearing, there was no established law regarding the effect of alcohol and drugs on the voluntariness of a *Miranda* waiver. And, when the state district court determined that Atcheson's actions were reasonable during its habeas review, there was no United States Supreme Court precedent on the topic. Therefore, we cannot say that counsel's failure to present cases on this point was unreasonable. And, furthermore, under AEDPA we cannot hold that the Nevada court's decision here was contrary to any established United States Supreme Court precedent.

## D

Matylinsky challenges Atcheson's decision to not strike second-alternate juror Mrs. Freeman ("Freeman") during voir dire. He argues that Atcheson should have removed Freeman for cause because she (1) knew Atcheson as a friend of her ex-husband; (2) stated that she might have negative thoughts about a man who beats his wife; and (3) was "probably" sure she could follow the court's instructions.

**[12]** Matylinsky cannot meet his burden to show constitutional violation as his challenge obviously fails at the second *Strickland* prong. The judge admonished the jurors at each break to not "discuss this case among [them]selves or with anyone else." Jurors are presumed to follow instructions given to them by the court. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) ("Absent such extraordinary situations, however, we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions."). There is no evidence that Freeman ever conferred with her fellow jurors regarding any view she had about the case and she never sat with the jury during its deliberations. Matylinsky can show no prejudice stemming from her mere presence as second-alternate juror.

## E

Matylinsky argues that Atcheson failed by not calling witnesses who would have testified to his good character. He lists forty-one friends who were willing to so testify during both the guilt and penalty phases. He believes the witnesses might have presented mitigating evidence and, ultimately, there would have been a better defense outcome in the case. This argument was not raised until after the last reasoned decision was given in the Nevada courts, requiring us to take an independent review of the record. *See Greene*, 288 F.3d at 1088-89.

**[13]** Matylinsky cites *Belmontes v. Ayers*, 529 F.3d 834, 866 (9th Cir. 2008), to support his argument that ineffective assistance can stem from counsel's failure to present evidence of a defendant's good character and the difficulties he faced as a youth. In *Belmontes*, we said that had the jury "considered the additional humanizing evidence that [counsel] could and should have presented through lay witness testimony . . . , there [was] a reasonable probability that the jury would have come to a different conclusion." *Id.*

Contrary to Matylinsky's contention, Atcheson presented lay witness testimony in an attempt to humanize him. Matylinsky's sister, Marilyn, testified regarding his troubled childhood dealing with his parents' abuse, neglect, and alcoholism. She explained the difficulties he had as an adult when dealing with his own alcoholism and abuse issues. She also discussed his feelings about his wife, the concern he showed for her during her pregnancy, and his excitement over the impending birth. Matylinsky's neighbor, Mardine Hammaker, also took the stand testifying that Matylinsky both supported Peggy and cared for her. Finally, Richard Marquez, Matylinsky's long-time friend, told the jury that Peggy continued to purchase alcohol for Matylinsky even though she knew about his problems with alcohol abuse.[7]

**[14]** Matylinsky fails to show what additional testimony his suggested forty-one witnesses would give in order to change the outcome of the trial. In his petition before the district court, he merely states that these individuals would testify to his good character. However, without informing the court as to what the nature of this testimony would be, it appears that

---

[7]Atcheson's presentation of character witnesses is in stark contrast with *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (en banc), where counsel's failure to call *any* mitigating witnesses at the penalty phase was found prejudicial to the defendant. *Id.* at 932 (stating that the testimony omitted at trial, but that was presented at an evidentiary hearing, might have led to a non-unanimous verdict).

Atcheson's choice of a few select character witnesses was not unreasonable. Furthermore, because Atcheson presented evidence tending to humanize Matylinsky, the petitioner cannot show prejudice for failure to present what is most likely cumulative evidence.

## F

Matylinsky argues that he should have been permitted to testify on his own behalf during the guilt phase of trial, but Atcheson prevented him from doing so. During an evidentiary hearing on his habeas claims, Matylinsky testified that he first discussed with Atcheson his desire to testify just days before the end of the trial. He said that Atcheson decided he would not take the stand, and if it had been left up to him, he would have testified to rebut other witnesses' testimony. Atcheson told Matylinsky that cross-examination regarding his prior convictions would be extremely damaging and that any other testimony he might give could be harmful. Matylinsky took the stand in his own defense during the penalty phase, in an attempt to avoid the death penalty. There he testified: "I didn't murder my wife, I killed her."

It was apparent to the state court that Atcheson "did not put Matylinsky on the stand because he did not want to subject him to cross-examination and his affect was flat." It found that Matylinsky's testimony "would have done him more harm than . . . good," and "would have shown a person seemingly indifferent to the crime." The court ultimately held that not allowing Matylinsky to testify was a "sound, tactical decision by [ ] Atcheson in this case."

**[15]** The *Strickland* standard is applicable when a petitioner claims his attorney was ineffective by denying him his constitutional right to testify. *Medley v. Runnels*, 506 F.3d 857, 861 (9th Cir. 2007). Matylinsky fails to meet the prejudice prong. He insists that his testimony would demonstrate to the jury that he neither premeditated nor deliberated, as required for

first-degree murder. However, the state court was not unreasonable in finding that this testimony would not have assisted Matylinsky's case. Had he taken the stand, he would have been subjected to damning cross-examination on his prior convictions.

[16] The jury also would have witnessed his matter-of-fact delivery regarding his wife's death and general disinterested nature. Additionally, his desire to discuss how Peggy instigated the fight that ultimately left her dead would have undermined the established theory of the case. *See id.* (where petitioner was not prejudiced because he would have been impeached on prior convictions and his testimony was inconsistent with the theory of the case). Matylinsky has not shown how his counsel acted unreasonably. And, to the extent Atcheson might have infringed on Matylinsky's right to testify, Matylinsky has not proven prejudice.

## G

Matylinsky next argues that counsel was ineffective for failing to investigate the results of an allegedly negative drug screen test. The district court found that this claim was unexhausted in the state courts. However, we hold that this portion of the district court's order granting summary judgment was in error. *See Matylinsky v. Budge*, No 08-15459, 2009 WL ___, at *2 (9th Cir. August 18, 2009).

[17] Even though this claim was properly exhausted and therefore not procedurally barred, it still fails on the merits. The drug results Matylinsky says Atcheson failed to review may have shown that Matylinsky had little or no cocaine in his system at the time he killed Peggy. We fail to see how Matylinsky was prejudiced by any failure to investigate this information, as it might have damaged his best available defense to murder.

## H

Matylinsky's final claim is that he was prejudiced when Atcheson failed to object at sentencing to the state's aggravating torture factor. "[I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). "The State must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Arave v. Creech*, 507 U.S. 463, 471 (1993) (internal quotation marks and citation omitted). In order to follow this mandate, Nevada has enumerated certain aggravating circumstances to first-degree murder which, if found by a jury, might permit a death sentence. *See* Nev. Rev. Stat. §§ 175.552, 200.033.

**[18]** Matylinsky points to the state's notice of intent to seek the death penalty, where it lists that the prosecution intended to prove, in addition to other aggravators, that Peggy's murder involved torture. However, this claim fails because there is no evidence that Matylinsky was at all prejudiced by the instruction contained in the notice. First, the jurors were not actually instructed on the torture aggravator, and there is no evidence in the record that they ever heard that the state intended to prove this aggravator. They were instructed on only two of the three noticed aggravating factors: (1) "the murder was commited [sic] by a person who knowingly created a great risk of death to more than one person," and (2) the "murder involved depravity of the mind." Additionally, the jury did not sentence Matylinsky to death, and therefore did not need to find any specific aggravators. To find a sentence of life without the possibility of parole, the jurors needed only to determine that Matylinsky should not be eligible for parole. It did not have to specify any aggravating factors when it rendered that decision.

## IV

We affirm the district court's order denying Matylinsky's petition for a writ of habeas corpus. We find that Ground 18(Q), which was held unexhausted by the federal district court, is exhausted and therefore was not procedurally barred. However, it too fails on the merits. Matylinsky has failed to show how Atcheson was ineffective as his trial counsel under the requirements set forth by the Supreme Court in *Strickland*. Nor are the rulings of the Nevada courts to that effect objectively unreasonable under AEDPA.

**AFFIRMED**.